**Thomas GUZICK, Jr., a minor, by his next friend and father, Thomas Guzick, Plaintiff,**

v.

**Donald L. DREBUS, Principal of Shaw High School and Nelson F. Leist, Supt., East Cleveland Board of Education, Robert Henderson, Charles Hamilton, Leslie Reardon, Erwin Schrader and G. Duke Beasley, as constituting the East Cleveland Board of Education, Defendants.**

No. C 69–209.

United States District Court
N. D. Ohio, E. D.
April 2, 1969.

---

Jerry Gordon, Cleveland, Ohio, for plaintiff.

Charles Clarke, Squire, Sanders & Dempsey, W. C. Hartman, Squire, Sanders & Dempsey, and Richard F. Stevens, Meyers, Stevens & Rea, Cleveland, Ohio, for defendants.

## MEMORANDUM OPINION AND ORDER

LAMBROS, District Judge.

This is an action arising under the provisions of Title 42 U.S.C.A. § 1983. This section provides as follows:

"Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."

The complaint, in summary, alleges the following: Thomas Guzick, Jr., is 17 years of age and is a student at Shaw High School in East Cleveland, Ohio. Defendant, Donald L. Drebus, is the principal of Shaw High School. The other defendants are: Nelson F. Leist, Superintendent of the East Cleveland School District; and Robert Henderson, Charles Hamilton, Leslie Reardon, Erwin Schrader, and George Beasley, who are members of the East Cleveland Board of Education. Plaintiff desires to wear a button on his lapel while attending school at Shaw High. The button reads:

"April 5 Chicago
G.I. Civilian
Anti-War
Demonstration
Student Mobilization Committee"

He wore this button to school on March 11, 1969. The school principal, Mr. Drebus, ordered the plaintiff to remove the button. Upon the plaintiff's refusal to remove the button, Mr. Drebus suspended him from Shaw High School until such time as he returned to school without the button. The complaint alleges that the acts of Mr. Drebus in suspending the plaintiff have been ratified, approved, or encouraged by the other defendants in their official capacities. Plaintiff alleges that his right to wear this button is protected by the First Amendment to the Constitution, and that his suspension deprives him of rights guaranteed by the Constitution; and, further, that his suspension was without just cause, without a hearing, and without due process of law. The

complaint alleges that similar buttons are being worn in other high schools in the Cleveland area, and that the acts of the defendants denying the plaintiff his right to wear a similar button deprives him of the equal protection of the law as guaranteed by the Fourteenth Amendment. The complaint seeks a temporary restraining order enjoining the defendants from interfering with the plaintiff's right to wear the button while attending school and from refusing to reinstate the plaintiff. It also seeks a preliminary and permanent injunction directed toward securing the same relief. The complaint further seeks a declaratory judgment that any rule or regulation of the East Cleveland Board of Education proscribing the wearing of such buttons is unconstitutional, and the complaint further seeks damages in the amount of $1000.00 per day for every day the plaintiff is compelled to miss school and for costs and attorneys' fees.

This action was filed with this Court on March 17, 1969. On Tuesday, March 18, the Court heard arguments on the plaintiff's motion for a temporary restraining order, as described above. At that time counsel for the defendants represented to the Court that the School Board had a general policy against the wearing of buttons and other insignia and that the School Board feared a disruption in the normal school activities if any buttons were permitted to be worn. The Court was of the opinion that if these representations were true and if the Court were to restrain the defendants pending a hearing on the plaintiff's motion for a preliminary injunction, disruption of the normal activities of Shaw High School would occur. The defendants also represented that they were willing to permit the plaintiff to return to classes without his button; and, under these circumstances, the Court concluded that it was more likely that irreparable harm would befall the defendants in the event this Court issued a temporary restraining order than would befall the plaintiff if the Court declined to issue a temporary restrain-ing order. Therefore, the Court overruled the plaintiff's motion for a temporary restraining order and set this matter down for a hearing on the plaintiff's motion for preliminary injunction at the earliest possible date.

On March 21, 1969, this Court began an evidentiary hearing on the plaintiff's motion for a preliminary injunction. That evidentiary hearing continued until Wednesday, March 26. More than 30 witnesses were heard; numerous exhibits were submitted to the Court. On the basis of the evidence adduced at that hearing, the Court makes the following determination.

### FINDINGS OF FACT

Certain of the factual issues in this case were not disputed. Many, however, were. The Court, as in other cases of this nature, is called upon to weigh the testimony of the various witnesses to determine what the true facts are and what the actual occurrences were. Such a determination is always difficult; but it is particularly difficult where, as here, there are direct conflicts in the testimony of the various witnesses.

The Court must give deserving weight to the testimony of each witness. In performing this task, the Court must assess the credibility of each witness. The Court has considered in great depth the demeanor of each witness upon the stand, his opportunity to observe the incidents which he described, and his opportunity to come by the knowledge which he claimed. The Court has also considered the interest and/or bias of each witness and his inclination as to the proper outcome of this case.

In a case where there are substantial factual disputes raised by the testimony of the various witnesses, their demeanor on the stand and their relative degree of knowledge are particularly important. The Court has, therefore, reviewed the evidence and its impressions of the various witnesses and has reached its considered judgment as to the actual facts in this case.

The city of East Cleveland, Ohio, is a suburb located east of Cleveland. At one time, it was an almost exclusively white community. In the last few years, however, many negroes have moved into the community from Cleveland, which is immediately adjoining; and East Cleveland now is a racially mixed community.

The East Cleveland Board of Education governs and regulates the operations of the East Cleveland schools. The City has a number of elementary schools; it has one junior high school, Kirk Junior High; and its only high school is Shaw High.

Shaw High School is not a new institution. It has served the East Cleveland community for at least fifty years. The main school building is old; and as a result of the increased number of students, other buildings have been added to Shaw High. Certain of the other buildings are attached to the main school building by a series of tunnels; at least one of the school buildings is not attached to the main building at all.

Because of the layout of the various buildings at Shaw High School, traffic patterns are bad. Since many of the buildings are old, the corridors, originally built for fewer students, are now congested. There are presently 1900 students at Shaw. The tunnels, in particular, are very crowded. The students are often required to walk long distances to their next class. Some chose to walk outside the building, even in inclement weather, to avoid the congestion and inconvenience of a trip through the tunnels.

Approximately 70% of the students at Shaw High School are black. Approximately 30% are white. There has been considerable friction between the students of the two races. There has also been friction among students of the same race. Nonetheless, Shaw High School has not, as yet, had a serious racial disturbance.

At the same time, many other high schools in the area have had such disturbances. At John Hay High, a predominately black school approximately one mile to the west, there have been repeated disturbances; and, in fact, John Hay High School was forced to close for a number of days as a result of these. East High School and Glenville High School have also had serious disturbances. East High was also required to close. Both of these high schools have a high percentage of black students.

Collinwood High School, which is racially mixed, has had serious disturbances. Indeed, these required the closing of the school at one time this year.

So far there have been no crippling disruptions at Shaw High. The situation, however, is not peaceful.

Although there have been no crippling disruptions of school activities, Shaw High has a significant, perhaps serious, discipline problem. Students have been threatened in both the men's rooms and locker rooms, among other places. These threats have often been accompanied by violence. Money has been extorted from students under these circumstances. The problem has been of such significance that the P.T.A. and other groups in the community have become concerned. There have been numerous fights at Shaw, both between blacks and whites and among students of the same race. These fights have occurred both during school hours and in the evening.

Tension at Shaw High is at an incendiary point. The school officials spend a great portion of their time disciplining students in an attempt to control this situation. In January of this year, black students attempted to organize a walkout. Such walkouts have occurred in a number of the other schools in the area. Shaw High officials were forced to call police to the school. The walkout was aborted, and only one student actually left the school.

These are but a few of the incidents described to the Court. It appears that the principal reason why more such in-

cidents have not occurred is the extensive effort by school officials to avert such situations by maintaining discipline and discussing these problems with the students and their parents.

For many years Shaw High has had an informal rule with respect to the wearing of emblems and other insignia. The rule has never been published; nevertheless, it has been applied uniformly and consistently for at least forty years at both Shaw High School and Kirk Junior High. To summarize the rule, it provides that students will not be permitted to wear buttons, emblems, or other insignia on school property during school hours unless these emblems or insignia are related to a school activity.

This informal rule has been applied in a wide variety of situations. School officials have applied it against the high school fraternities and sororities which existed at Shaw in the 1940's. Emblems signifying or indicating membership in any of these fraternities were prohibited. Students wearing them were asked to remove them or leave school.

Subsequently, informal clubs replaced the outlawed high school fraternities. The rule was applied to these clubs. Pins, emblems, lavalieres, lettering on clothing, and other insignia have not been permitted at Shaw High School.

The rule was created in response to a problem which Shaw has had over a period of many years. At the time high school fraternities were in vogue, the various fraternities at Shaw were a divisive and disruptive influence on the school. They carved out portions of the school cafeteria in which only members of a particular fraternity were permitted to sit. The fraternities were competitive and engaged in activities which disrupted the educational process at Shaw. There were fights between members of the individual fraternities and often strong feelings between the members.

The same problem was encountered with the informal clubs, which replaced high school fraternities and sororities.

The problem again exists as a result of the racial mixture at Shaw. Buttons, pins, and other emblems have been used as identifying "badges." They have portrayed and defined the divisions among students in the school. They have fostered an undesirable form of competition, division and dislike. The presence of these emblems, badges and buttons are taken to represent, define and depict the actual division of the students in various groups.

The buttons also encourage division among the students, for they portray and identify the wearer as a member of a particular group or the advocate of a particular cause. This sets the wearer apart from other students wearing different buttons or without buttons. It magnifies the differences between students, encourages emphasis on these differences, and tends to polarize the students into separate, distinct, and unfriendly groups. In addition, there have been instances in which students have attempted to force other students to wear a particular manner of dress or to wear their particular insignia or expressive button. For these reasons Shaw High officials have enforced the anti-button rule and have prohibited the wearing of such indicia.

The rule has acquired a particular importance in recent years. Students have attempted to wear buttons and badges expressing inflammatory messages, which, if permitted, and as the evidence indicates, would lead to substantial racial disorders at Shaw. Students have attempted to wear buttons with the following messages inscribed thereon. "White is right"; "Say it loud, Black and Proud"; "Black Power." Other buttons have depicted a mailed black fist, commonly taken to be the symbol for black power.

There have been occasions when the wearing of such insignia has led to disruptions at Shaw and at Kirk Junior High. A fight resulted in the cafeteria when a white student wore a button which read "Happy Easter, Dr. King."

(Dr. Martin Luther King was assassinated in the Easter season.) On another occasion, students at Kirk Junior High entered the corridors wearing a distinctive headdress. They proceeded down the corridors striking and attacking certain other students whom they had expected would join them in wearing the headdress, but who had not done so.

School authorities have attempted to eliminate the wearing of buttons, emblems, other insignia, and distinctive forms of dress characteristic of a particular club or group. The evidence discloses a number of instances in which various individuals and groups attempted to wear such insignia or clothing and in which the school officials prohibited it. The evidence also discloses isolated instances in which buttons or other insignia have been worn. It appears, however, that in these cases the wearing was not the result of permission by the school authorities, but was rather the case of the particular emblem going unnoticed.

On March 11, 1969, the plaintiff, Thomas Guzick, Jr., in the company of Hunter Havens, went to the office of the principal of Shaw High, Mr. Donald Drebus. Both the plaintiff and Mr. Havens wore a button on their clothing inscribed with the message:
"April 5 Chicago
G.I. Civilian
Anti-War
Demonstration
Student Mobilization Committee"
Plaintiff also carried certain leaflets which he and Mr. Havens desired to distribute at Shaw High School.

The conversation had that morning between the two students and Mr. Drebus is in dispute. It appears, however, that the students requested permission to pass out the leaflets at the school. Mr. Drebus refused permission, stating that Shaw High had a policy against distribution of leaflets. Mr. Drebus demanded that the students remove the buttons which they were wearing. The students asserted that they had a constitutional right to wear such buttons. Hunter Havens removed his. The plaintiff, however, refused to remove his button, even after a warning by Mr. Drebus that he would suspend the plaintiff from school if he refused to remove it. Upon the plaintiff's further refusal to remove the button, he was suspended from school until such time as he returned without the button. Subsequently, the plaintiff filed suit with this Court seeking a legal determination whether he is entitled under the Constitution to wear this button at Shaw High School.

As outlined above, the Court has concluded that Shaw High School has had a long-standing and consistently-applied rule prohibiting the wearing of buttons and other insignia on school grounds during school hours, unless these are related to a school-sponsored activity. The Court finds that this rule has been a significant factor in preserving peace and good order at Shaw High School and in preventing provocations, distractions, and disruptive conduct. The Court finds that if this policy of excluding buttons and other insignia is not retained, some students will attempt to wear provocative or inciting buttons and other emblems. If these provocative buttons and insignia are permitted to be worn, they will further amplify an already serious discipline problem, they will exacerbate an already tense racial situation, and they will inevitably cause substantial disruptions in the educational process at Shaw High.

The Court further finds that if students are permitted to wear *some* buttons but not others, similar disruptions of the educational process will occur. Many students will not understand the justification for any rule that prohibits the wearing of certain buttons while permitting others. Many will not accept the distinction.

In addition, any rule which attempts to permit the wearing of some buttons, but not others, would be virtually impossible to administer. It would involve school officials in a continuous search of the halls for students wearing the prohibited type of buttons. It would occasion ad hoc and inconsistent application.

It would make the determination of permissible versus impermissible buttons difficult, if not impossible. It would make it difficult for the school officials to give both the substance and appearance of fairness, and would deprive the school officials of their present position of neutrality.

A rule which permitted the wearing of some buttons but not others would itself be disruptive. Many of the buttons which are most sought to be worn are of the provocative and inciting type. If a line is drawn between provocative and non-provocative buttons, the students most desiring to wear buttons, who desire to wear buttons of a provocative type, will feel discriminated against. As one of the witnesses indicated, there are many people both in the school and in the community who are looking for an incident upon which to base a disruption of the Shaw High School educational process. The wearing of buttons at Shaw High would greatly affect the discipline problem and will require that school administrators devote an even greater portion of their time to discipline. Buttons will raise the emotions of students at Shaw High, distract them from their educational pursuits, and exacerbate a type of racial tension which is "peculiar to Shaw," as one witness put it.

As the Court has found above, a rule permitting the wearing of some buttons and not others will itself lead to disruptions of the educational process at Shaw. Similarly, the rule which permits the wearing of any button will occasion the wearing of provocative and inciting buttons and will also disrupt the educational process.

The Court finds that the prohibition of buttons and other insignia at Shaw High significantly contributes to the preservation of peace and order, and that the blanket prohibition of buttons and other insignia is reasonably related to the prevention of the distractions and disruptive and violent conduct at Shaw High. The Court finds that if all buttons are permitted or if any buttons are permitted, a serious discipline problem will result, racial tensions will be exacerbated, and the educational process will be significantly and substantially disrupted.

## CONCLUSIONS OF LAW

On February 24, 1969, the United States Supreme Court decided Tinker v. Des Moines Independent Community School District, 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731. This is the landmark case in the area of the student's rights to free speech in the public schools, and it has formed the basis of this litigation.

The *Tinker* case involved the wearing of black arm bands in protest against this country's involvement in the Vietnam War. The Supreme Court invalidated a school regulation prohibiting the wearing of these arm bands.

The Court noted that the wearing of an expressive arm band is "closely akin" to "pure speech." It was, in substance, the silent expression of an idea.

The *Tinker* case holds:

" * * * Where there is no finding and no showing that the exercise of the forbidden right would 'materially and substantially interfere with the requirements of appropriate discipline in the operation of the school,' the prohibition cannot be sustained." 393 U.S. at 509, 89 S.Ct. at 738.

In the *Tinker* case there was, of course, no such disruption. Rather, the Supreme Court concluded that the action of the school officials was based on an "undifferentiated fear" that a disturbance *might* be occasioned by the wearing of the arm bands and any ensuing discussions or arguments.

There was little evidence in *Tinker* to indicate that a disorder might arise from the wearing of buttons. One graduate of the school had been killed in the Vietnam War; and the school board feared that if any demonstration began, it might evolve into something which might be difficult to control. In addition, some of the other students indicated that, if the black arm bands were permitted, they might wear different colored bands. As the

Supreme Court stated, there was no evidence the school authorities "had reason to anticipate that the wearing of the arm bands would substantially interfere with the work of the school or infringe on the rights of other students." 393 U.S. at 509, 89 S.Ct. at 738. The Court noted: "As we have discussed, the record does not demonstrate any facts which might reasonably have led school authorities to forecast substantial disruption or a material interference with school activities, and no disturbances or disorders on school premises in fact occurred." 393 U.S. at 514, 89 S.Ct. at 740.

The regulation in the *Tinker* case was not applied in an even-handed manner. Other buttons and symbols of political and controversial significance were permitted to be worn in the school. The Court concluded that the regulation was directed at the principle expressed in this particular demonstration—that is, opposition to the Vietnam War. The school authorities, the Court concluded, wanted not to introduce the Vietnam controversy into the school.

Certain factors, present in the *Tinker* case, and upon which the Court rested its decision, are not present here. The rule prohibiting the wearing of emblems at Shaw High School is one of long standing. It has been applied evenhandedly both in politically controversial and non-controversial areas. The Shaw High authorities have prohibited black students from wearing various emblems depicting Dr. Martin Luther King and espousing the ideas of black power. They have prohibited white students from wearing buttons and other emblems depicting their ideas on the racial situation. They have prohibited the wearing of fraternity, sorority, and other club insignia. They have applied this rule consistently; they have applied it equally. The rule is applied (and it is applied in this case) without regard to the content and the ideas sought to be expressed in the emblem. It is applied without regard to the status of the wearer or to the message, inflammatory or innocuous, sought to be expressed.

Furthermore, there is in the present case much more than an "undifferentiated fear or apprehension" of disturbances likely to result from the wearing of buttons at Shaw High School. The wearing of buttons and other emblems and insignia has occasioned substantial disruptive conduct in the past at Shaw High. It is likely to occasion such conduct if permitted henceforth. The wearing of buttons and other insignia will serve to exacerbate an already tense situation, to promote divisions and disputes, including physical violence among the students, and to disrupt and interfere with the normal operation of the school and with appropriate discipline by the school authorities.

The button at issue in the instant case did not convey an inflammatory message. It does, however, portray the position of the wearer with respect to a political issue. Although there was evidence that the message conveyed in this particular button might be such as to inflame some of the students at Shaw High, the Court does not feel that such a result is likely.

On the other hand, if this button were permitted by the school authorities, there would no longer be a rule prohibiting all emblems and insignia at Shaw High School. The school authorities would be faced with a situation in which they would have to decide whether to permit all buttons or to permit some, but not all, buttons.

The Court has concluded that if all buttons were permitted at Shaw High, many students would seek to wear buttons conveying an inflammatory or provocative message or which would be considered as an insult or affront to certain of the other students. Such buttons have been worn at Shaw High School in the past. One button of this nature, for example, contained the message "Happy Easter, Dr. King." This button caused a fight last year in the school cafeteria at Shaw. Other buttons, such as "Black Power," "Say it loud, Black and Proud," and buttons depicting a black mailed fist have been worn at Shaw and would likely be worn again, if permitted. These but-

tons would add to the already incendiary situation and would undoubtedly provoke further fighting among the students and lead to a material and substantial disruption of the educational process at Shaw High.

To avoid the situation in which inflammatory and often insulting buttons would be worn at Shaw High, the school administration would be required to adopt a policy permitting certain buttons and excluding others. Such a policy would be unworkable in the context of Shaw High School and would very likely lead to disruption itself. It would be nearly impossible for the school authorities to adopt and define a policy which would satisfactorily distinguish between buttons which would be permitted and those which would not.

Any attempt to enforce such a policy would likely entangle the school authorities in the First Amendment prohibition against prior restraints on free speech. In addition, such a policy could not practically be enforced, for it would require the school authorities to patrol the halls and classes in search of offending buttons. It is unlikely that the students would understand or agree with the basis for the permission and exclusion of various buttons, even if the policy were announced as a general written rule. It would be virtually impossible to distinguish between buttons on any permissible basis, since even innocuous buttons on certain issues would inflame the situation at Shaw High and inflammatory buttons on other issues would have no effect.

School discipline at Shaw is possible because it is administered on an impartial basis. School authorities have attempted to maintain both the position and image of complete neutrality. The adoption of a rule permitting some buttons and excluding others would necessarily involve the school administration in the controversies at Shaw High. The school authorities would no longer be neutral regulators but active participants. This itself would undermine the structure of discipline at Shaw High and materially and substantially affect the educational process.

The school authorities have adopted the policy of excluding all insignia and emblems, in view of the explosive situation and the likelihood of substantial disruption if provocative emblems are permitted. This Court is unprepared to say that the rule excluding all buttons is unreasonable, in view of the difficulty in applying a selective rule and in view of the real likelihood that such a rule would itself contribute to disruption. This Court is also unprepared to say that the school authorities were unreasonable in rejecting such a selective rule.

The chain of events likely to occur if buttons are permitted at Shaw High is fairly certain. If one button is worn with school permission, then other buttons would also be worn. The school would be unable to enforce a policy which attempts to exclude some buttons. Students will feel that if some individuals are permitted to wear buttons of their choice, then all should be permitted to wear buttons of their choice. Inflammatory and provocative buttons will undoubtedly be worn; they will undoubtedly lead to fights and disruptions, walkouts, and an explosive racial situation. In the present case, unlike the *Tinker* case, there is more than an "undifferentiated fear" of a disturbance. There is a history of such disturbances caused or provoked by emblems. There is good reason to anticipate that disturbances will result in the future, if buttons are permitted. An uneasy truce exists now between the various groups in which there is a tacit understanding that buttons will not be worn by anyone. If one button is worn with school permission, then others will deem themselves deprived, if they are not also permitted to wear the buttons of their choice.

In the instant case, the wearing of the buttons is substantially related to the occurrence of conduct which school authorities are entitled to prevent. They have, therefore, applied the rule at issue here. They have applied it in an even-

handed manner; they have applied it consistently. This Court concludes that such a rule is reasonably related to the prevention of disruptive conduct at Shaw High School.

The wearing of buttons or, as in the *Tinker* case, wearing of arm bands is itself and without accompanying conduct "closely akin" to "pure speech." Nevertheless, wearing of such insignia has other characteristics different from pure speech. A button is not merely a statement; it is an identification tag. It identifies the wearer as an adherent or member of one group or class. It identifies him as not being a member of other groups or classes. This identification aspect exists independent of the nature of the message contained in the button. Thus, for example, a button on which appears a mailed black fist certainly identifies the wearer with a particular political persuasion. This is apart from any message sought to be conveyed by the button.

The button also demonstrates that the wearer has a particular and keen interest in the goals and outlook of the group with which the button identifies him. It marks the wearer as a proponent; it also may mark him as someone's opponent. In so doing, buttons have an inherent tendency to divide a body of individuals into separate subgroups, each identified by its own insignia, each declaring by a particular decoration its position in relation to other individuals. Such an effect may not be significant in the context of many high schools in this country. But because of the "peculiar situation" at Shaw High, this divisive influence is likely and, indeed, almost certain to lead to disruptive conduct. When there is added the fact that many of these expressive buttons are likely to convey that expression in a most inflammatory and, perhaps, insulting manner, it is apparent that a most dangerous situation will result.

Free speech is the single most important element upon which this nation has thrived. Wherever reasonably possible, it must be upheld, cherished, and nurtured. There are, however, situations in which free speech, or manifestations which are "closely akin" to free speech, must be exercised with care and restraint; and there are situations in which the manifestations of speech may even be prohibited altogether. It has been demonstrated that the identifying aspects of buttons and other insignia have led to considerable disruption at Shaw High in the past. It has also been demonstrated that such insignia would be likely and, indeed, more likely to lead to such disruptions if permitted now.

We bear in mind that the buttons and other insignia are not speech themselves. Rather, they are a pictorial manifestation of speech. As such, they acquire other characteristics which would not be possessed by the spoken word itself. Buttons and other insignia have an inherently identifying nature. They are in a sense "badges." It is this aspect of emblems and other insignia that has caused difficulty at Shaw High. It is this aspect, and not the actual speech of any of the students, which has been prohibited and which is at issue here.

Perhaps the best example of the dichotomy between that which school officials may prohibit and that which they must permit is presented by two cases decided by the United States Court of Appeals for the Fifth Circuit on the same day. Burnside v. Byars, 363 F.2d 744 (5th Cir. 1966) is the first of these cases.[1] Students there were seeking to wear buttons bearing the message "one man one vote" around the perimeter with "SNCC" inscribed in the center. The school officials prohibited them from wearing these buttons and suspended a number of students for refusing to remove them. According to the school officials, they prohibited the buttons because they feared that they would cause a commotion and because they had no bearing on the students' education. The school authorities were afraid that but-

---

1. This case was specifically relied upon by the Supreme Court in the *Tinker* case.

tons would be passed around and discussed in the classrooms. There was evidence that they did cause a "commotion" in the halls when they were passed out as students sought to see the buttons. The Court characterized the response of the students to these buttons as "mild curiosity." The school authorities had only prohibited the wearing of what were termed "freedom buttons," and had permitted the wearing of other buttons of a political nature.

The Court invalidated the regulation on the grounds that it was "arbitrary and unreasonable, and an unnecessary infringement on the students' protected right of free expression." 363 F.2d at 748, 749.

The Court noted that the state and school officials had a substantial interest in providing for an orderly educational process, and that the school officials have wide discretion in prescribing rules of conduct:

"The interest of the state in maintaining an educational system is a compelling one, giving rise to a balancing of First Amendment rights with the duty of the state to further and protect the public school system. The establishment of an educational program requires the formulation of rules and regulations necessary for the maintenance of an orderly program of classroom learning. In formulating regulations, including those pertaining to the discipline of school children, school officials have a wide latitude of discretion. But the school is always bound by the requirement that the rules and regulations must be reasonable. It is not for us to consider whether such rules are wise or expedient but merely whether they are a reasonable exercise of the power and discretion of the school authorities." 363 F.2d at 748.

The Court also defined what it would consider to be a reasonable regulation:

"Regulations which are essential in maintaining order and discipline on school property are reasonable. Thus school rules which assign students to a particular class, forbid unnecessary discussion in the classroom and prohibit the exchange of conversation between students are reasonable even though these regulations infringe on such basic rights as freedom of speech and association, because they are necessary for the orderly presentation of classroom activities. Therefore, a reasonable regulation is one which measurably contributes to the maintenance of order and decorum within the educational system." 363 F.2d at 748.

The other case decided by the Fifth Circuit on that day is Blackwell v. Issaquena County Board of Education, 363 F.2d 749 (5th Cir. 1966). The students in the Blackwell case also wore SNCC buttons. In addition to the inscription, they depicted a black and white hand joined together. In the Blackwell case, however, the buttons had occasioned disruptive conduct by the pupils. They passed them out in the corridors of the school and attempted to pin them on students who did not want them. When told to remove the buttons, the students were belligerent and insulting. When told to leave school, they disrupted some of the classes. After a number of attempts to have the students remove the buttons, the students were told that they would be suspended unless they removed them. A number of students did not; they were suspended and litigation ensued.

The Court in the Blackwell case found that the regulation in question was reasonable. Citing its opinion in Burnside, it defined a reasonable regulation as " * * * one which is 'essential in maintaining order and discipline on school property' and 'which measurably contributes to the maintenance of order and decorum within the educational system.' " 363 F.2d at 753.

In the Blackwell case, the prohibition against buttons was reasonably related to the prevention of the disruptive conduct. The buttons had been the occasion of this conduct. The school authorities were entitled to prevent the conduct, and

the prohibition against buttons was reasonably related to prevention.

Applying the above principles to the present case, it appears that the regulation must be upheld. The prohibition of buttons and other insignia at Shaw High is the result of a history of problems which the Shaw High authorities have encountered as a result of this activity. The prohibition against buttons is reasonably related in preventing the occurrence of disruptive conduct. It is also reasonably related to what is administratively possible at Shaw High School. If any buttons are permitted to be worn at Shaw High, it is likely that students will require that all buttons be permitted. In any event, the wearing of any buttons will lead to disruptive, even violent, activities, will materially and substantially affect the normal educational processes at Shaw High, and will diminish significantly the ability of the school officials to maintain proper discipline.

In this case, it is relevant that the school authorities *did* prohibit the wearing of all symbols and applied the rule uniformly and consistently. This was not the case in *Tinker*.

It is also relevant that the wearing of a button by the plaintiff in this case was associated with a distribution of leaflets. This was not the case in *Tinker*.

An evidentiary pattern has developed in this case which specifically shows to this Court that the school authorities had a constitutionally valid reason to regulate student conduct regarding the wearing of buttons and other emblems and symbols. This was not the case in *Tinker*.

It is also relevant that buttons of all kinds, shapes and sizes are finding their way into the school system. Many of these are innocuous, many are controversial and provocative, and many are downright immoral and sinister. These buttons find their way into the school system by way of adult groups or organizations of all types seeking to promote their cause by overpowering the tender minds of our youth; others find their way into the schools by way of novelty salesmen capitalizing on the emotional upheaval of the times by printing anything on buttons which will produce a profit.

Now, if all these buttons bore a reasonable relationship to free speech, then, no restraint should be placed on the wearing thereof; but, let's take a look at what is being peddled in the Cleveland area. Buttons with the following inscriptions: "KKK," "White and Right," "Say it loud, Black and Proud," "Happy Easter, Dr. King," a black mailed clinched fist, "Boycott Grapes," and many others too numerous to set forth.

It is also relevant that leaflets of all kinds are being distributed and circulated throughout the public schools, and specifically at Shaw High School, and finding their way on the bulletin boards. Many of these are of a harmless nature, but many of these are downright immoral and sinister, such as, defendants' Exhibit B distributed by SDS, which was posted on the Shaw High School bulletin board. It encouraged a demonstration in Washington opposing our political leaders and, among other things, contained this phrase: "Don't let the bastards grind you down!"

It is also relevant in the instant case that one of the pamphlets which was circulated at Shaw High School by the Student Mobilization Committee advertised a city-wide meeting to consider a possible high school strike.

The regulation prohibiting the wearing of the button is an appropriate standard of behavioral conduct which is reasonably relevant to the mission and function of Shaw High School.

The regulation is not discriminatory nor unreasonable, arbitrary or capricious. The rule does not deny a federally protected constitutional right.

Upholding the Shaw High School rule prohibiting buttons or other symbols does not sound the death knell for student freedom of speech.

The evidence in this case has made it abundantly clear that the school authori-

**484**

ties have a factual basis upon which to forecast substantial disruption of, or material interference with, school activities if student behavioral conduct regarding the wearing of buttons is not regulated.

Therefore, the Court finds the issues in this case in favor of the defendants; and the plaintiff's claim for injunctive relief and damages is denied.

It is, therefore, ordered that this cause be and is hereby dismissed and terminated.