**Thomas GUZICK, Jr., a minor, by his next friend and father, Thomas Guzick, Plaintiff-Appellant,**

**v.**

**Donald L. DREBUS et al., Defendants-Appellees.**

**No. 19681.**

United States Court of Appeals, Sixth Circuit.

Sept. 16, 1970.

Jerry Gordon, Cleveland, Ohio, for appellant Benjamin B. Sheerer, Rudd, Miller, Sheerer & Lybarger, Cleveland, Ohio, on brief.

Charles F. Clarke, Cleveland, Ohio, for appellees, William C. Hartman, George W. Pring, Cleveland, Ohio, on brief, Squire, Sanders & Dempsey, Richard F. Stevens, Cleveland, Ohio, of counsel.

Before WEICK, Circuit Judge, and McALLISTER and O'SULLIVAN, Senior Circuit Judges.

O'SULLIVAN, Senior Circuit Judge.

Plaintiff-Appellant, Thomas Guzick, Jr.,—prosecuting this action by his father and next friend, Thomas Guzick—appeals from dismissal of his complaint in the United States District Court for the Northern District of Ohio, Eastern Division. Plaintiff's complaint sought an injunction and other relief against defendant Drebus, the principal of Shaw High School in East Cleveland, Ohio, as well as against the Superintendent and Board of Education for the schools of said city. Plaintiff also asked for declaratory relief and damages.

The complaint charged that Thomas Guzick, Jr., a seventeen year old, eleventh grade student at Shaw High School, had been denied the right of free speech guaranteed to him by the United States Constitution's First Amendment. He asserted that this right had been denied him when he was suspended for refusing to remove, while in the classrooms and the school premises, a button which solicited participation in an anti-war demonstration that was to take place in Chicago on April 5. The legend of the button was:

> "April 5 Chicago
> GI—Civilian
> Anti-War
> Demonstration
>
> Student Mobilization Committee"

With the currency of reliance on the First Amendment as support for so many and so varied claims for relief in the federal courts, it would be well to remind ourselves of that Amendment's exact language.

> "ART. 1. Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the government for a redress of grievances."

On March 11, 1969, young Guzick and another student Havens, appeared at the office of defendant Drebus, principal of the high school, bringing with them a supply of pamphlets which advocated attendance at the same planned Chicago anti-war demonstration as was identified by the button. The boys were denied permission to distribute the pamphlets, and were also told to remove the buttons which both were then wearing. Guzick said that his lawyer, counsel for him in this litigation, told him that a United States Supreme Court decision entitled him to wear the button in school. Principal Drebus directed that he remove it and desist from wearing it in the school. Being told by Guzick that he would not obey, the principal suspended him and advised that such suspension would continue until Guzick obeyed. The other young man complied, and returned to school. Guzick did not, and has made no effort to return to school. This lawsuit promptly followed on March 17. The complaint prayed that the school authorities be required to allow Guzick to attend school wearing the button, that it be declared that Guzick had a constitutional right to do so, and that damages of $1,000 be assessed for each day of school missed by Guzick as a result of the principal's order.

The District Judge denied plaintiff's application for a preliminary injunction, and after a plenary evidentiary hearing, which was concluded on March 26, 1969, the complaint was dismissed. The opinion and judgment of the District Judge were filed and entered on April 2, 1969. The case is reported as Guzick v. Drebus, 305 F.Supp. 472 (N.D.Ohio 1969).

We affirm.

Plaintiff insists that the facts of this case bring it within the rule of Tinker v. Des Moines Independent Community School District, 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969). We are at once aware that unless *Tinker* can be distinguished, reversal is required. We consider that the facts of this case clearly provide such distinction.

The rule applied to appellant Guzick was of long standing—forbidding all wearing of buttons, badges, scarves and other means whereby the wearers identify themselves as supporters of a cause or bearing messages unrelated to their education. Such things as support the high school athletic teams or advertise a school play are not forbidden. The rule had its genesis in the days when fraternities were competing for the favor of the students and it has been uniformly enforced. The rule has continued as one of universal application and usefulness. While controversial buttons appeared from time to time, they were required to be removed as soon as the school authorities could get to them.

Reciting the history of the no button or symbol rule, and the fact that the current student population of Shaw High School is 70% black and 30% white, the District Judge observed:

"The rule was created in response to a problem which Shaw has had over a period of many years. At the time high school fraternities were in vogue, the various fraternities at Shaw were a divisive and disruptive influence on the school. They carved out portions of the school cafeteria in which only members of a particular fraternity were permitted to sit. The fraternities were competitive and engaged in activities which disrupted the educational process at Shaw. There were fights between members of the individual fraternities and often strong feelings between the members.

"The same problem was encountered with the informal clubs, which replaced high school fraternities and sororities. The problem again exists as a result of the racial mixture at Shaw. Buttons, pins, and other emblems have been used as identifying 'badges.' They have portrayed and defined the divisions among students in the school. They have fostered an undesirable form of competition, division and dislike. The presence of these emblems, badges and buttons are taken to represent, define and depict the actual division of the students in various groups.

"The buttons also encourage division among the students, for they portray and identify the wearer as a member of a particular group or the advocate of a particular cause. This sets the wearer apart from other students wearing different buttons or without buttons. It magnifies the differences between students, encourages emphasis on these differences, and tends to polarize the students into separate, distinct, and unfriendly groups. In addition, there have been instances in which students have attempted to force other students to wear a particular manner of dress or to wear their particular insignia or expressive button. For these reasons Shaw High officials have enforced the anti-button rule and have prohibited the wearing of such indicia.

"The rule has acquired a particular importance in recent years. Students have attempted to wear buttons and badges expressing inflammatory messages, which, if permitted, and as the evidence indicates, would lead to substantial racial disorders at Shaw. Students have attempted to wear buttons with the following messages inscribed thereon. 'White is right'; 'Say it loud, Black and Proud'; 'Black Power.' Other buttons have depicted a mailed black fist, commonly taken to be the symbol of black power.

"There have been occasions when the wearing of such insignia has led to disruptions at Shaw and at Kirk Junior High. A fight resulted in the cafeteria when a white student wore a button which read 'Happy Easter, Dr. King.' (Dr. Martin Luther King was assassinated in the Easter season.)" 305 F.Supp. at 476–477.

From the total evidence, including that of educators, school administrators and others having special relevant qualifications, the District Judge concluded that abrogation of the rule would inevitably result in collisions and disruptions which would seriously subvert Shaw High

School as a place of education for its students, black and white.[1]

### 1. The Rule of *Tinker*.

Contrasting with the admitted long standing and uniform enforcement of Shaw's no symbol rule, the majority opinion in *Tinker* was careful to point out,

"It is also relevant that the school authorities [in *Tinker*] did not purport to prohibit the wearing of all symbols of political or controversial significance. The record shows that students in some of the schools wore buttons relating to national political campaigns, and some even wore the Iron Cross, traditionally a symbol of Nazism. *The order prohibiting the wearing of armbands did not extend to these.* Instead, a particular symbol—black armbands worn to exhibit opposition to this Nation's involvement in Vietnam—was singled out for prohibition." 393 U.S. at 510–511, 89 S.Ct. at 738–739.

The armband demonstration in *Tinker* was a one time affair, with a date for its ending fixed in its original plan. Plaintiff here argues that Shaw's no symbol rule should be abrogated to accommodate his wish to be relieved from obeying it. The majority in *Tinker* emphasized that it was following what had been "the unmistakable holding of this Court for almost 50 years." 393 U.S. at 506, 89 S.Ct. at 736. Opinions of Mr. Justice McReynolds in Meyer v. Nebraska, 262 U.S. 390, 43 S.Ct. 625, 67 L.Ed. 1042 (1923) and Bartels v. Iowa, 262 U.S. 404, 43 S.Ct. 628, 67 L.Ed. 1047 (1923), were referred to as announcing the long standing rule that the United States Constitution must be respected by those who operate our public schools. West Virginia State Bd. of Education v. Barnette, 319 U.S. 624, 63 S.Ct. 1178, 87 L.Ed. 1628 (1943) was cited to em-

phasize the relevancy of the First Amendment in public school administration. However, *Meyer* and *Bartels* struck down state statutes which forbade the teaching of a foreign language to young students and *Barnette* held that it was constitutionally impermissible to compel young students to salute the flag. These authorities while they do confirm the presence of the Constitution in our public schools, bear no resemblance to the critical facts of the case at bar. Neither do any of the other decisions of the Supreme Court cited in *Tinker*, 393 U.S. on pages 506 and 507, 89 S.Ct. 733 of the opinion.

Further distinguishing *Tinker* from our case are their respective settings. No potential racial collisions were background to *Tinker*, whereas here the changing racial composition of Shaw High from all white to 70% black, made the no symbol rule of even greater good than had characterized its original adoption. In our view, school authorities should not be faulted for adhering to a relatively non-oppressive rule that will indeed serve our ultimate goal of meaningful integration of our public schools. Such was the command of Brown v. Board of Education, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954).

### 2. Shaw High School's need for its Rule.

In *Tinker* the Court concluded that a regulation forbidding expressions opposing the Vietnam conflict anywhere on school property would violate the students' constitutional rights,

"at least *if it could not be justified* by a showing that the students' activities would materially and substantially disrupt the work and discipline of the school." 393 U.S. at 513, 89 S.Ct. at 740 (Emphasis supplied.)

---

1. He concluded that this was so even though he did not find the message of the particular button inflammatory, per se, "Although there was evidence that the message conveyed in this particular

button might be such as to inflame some of the students at Shaw High, the Court does not feel that such a result is likely." 305 F.Supp. at 479.

The Supreme Court then went on to say that the District Judge in *Tinker* made no such finding and that,

"our independent examination of the record fails to yield evidence that the school authorities had reason to anticipate that the wearing of the armbands would substantially interfere with the work of the school or impinge upon the rights of other students. Even an official memorandum prepared after the suspension that listed the reasons for the ban on wearing the armbands *made no reference to the anticipation of such disruption.*" 393 U.S. at 509, 89 S.Ct. at 738 (Emphasis supplied.)

But in the case at bar, the District Judge, upon a valid appraisal of the evidence, did find that "if all buttons are permitted or if any buttons are permitted, a serious discipline problem will result, racial tensions will be exacerbated, and the educational process will be significantly and substantially disrupted." 305 F.Supp. at 478. Again, in *Tinker*, the majority said,

"But, in our system, undifferentiated fear or apprehension of disturbance is not enough to overcome the right of freedom of expression." 393 U.S. at 508, 89 S.Ct. at 737.

Here, the District Court, conscious of the commands of *Tinker*, said,

"Furthermore, there is in the present case *much more than an 'undifferentiated fear or apprehension'* of disturbances likely to result from the wearing of buttons at Shaw High School. The wearing of buttons and other emblems and insignia has occasioned substantial disruptive conduct in the past at Shaw High. It is likely to occasion such conduct if permitted henceforth. The wearing of buttons and other insignia will serve to exacerbate an already tense situation, to promote divisions and disputes, including physical violence among the students, and to disrupt and interfere with the normal operation of the school and with appropriate discipline by the school authorities." 305 F.Supp. at 479 (Emphasis supplied).

The District Judge was of the view that the situation at Shaw was "incendiary." The evidence justified such a view.

"The Court has concluded that if all buttons were permitted at Shaw High, many students would seek to wear buttons conveying an inflammatory or provocative message or which would be considered as an insult or affront to certain of the other students. Such buttons have been worn at Shaw High School in the past. One button of this nature, for example, contained the message 'Happy Easter, Dr. King.' This button caused a fight last year in the school cafeteria at Shaw. Other buttons, such as 'Black Power,' 'Say it loud, Black and Proud,' and buttons depicting a black mailed fist have been worn at Shaw and would likely be worn again, if permitted. These buttons would add to the already incendiary situation and would undoubtedly provoke further fighting among the students and lead to a material and substantial disruption of the educational process at Shaw High." 305 F.Supp. at 479, 480.

Further distinction from *Tinker* is provided by the long standing and *universal application* of Shaw's rule. In *Tinker* the majority said:

"The record shows that students in some of the schools wore buttons relating to national political campaigns and some even wore the Iron Cross, traditionally a symbol of Nazism. The order prohibiting the wearing of armbands *did not extend to these.* Instead, a particular symbol—black armbands worn to exhibit opposition to this Nation's involvement in Vietnam —was singled out for prohibition." 393 U.S. at 510, 511, 89 S.Ct. at 739. (Emphasis supplied.)

The District Judge here points out that for school authorities to allow some buttons and not others would create an *unbearable burden of selection and enforcement.* He said:

"In addition, any rule which attempts to permit the wearing of some but-

tons, but not others, would be virtually impossible to administer. It would involve school officials in a continuous search of the halls for students wearing the prohibited type of buttons. It would occasion ad hoc and inconsistent application. It would make the determination of permissible versus impermissible buttons difficult, if not impossible. It would make it difficult for the school officials to give both the substance and appearance of fairness, and would deprive the school officials of their present position of neutrality." 305 F.Supp. at 477–478.

We believe that the Supreme Court has commanded that, when dealing with questions of constitutional magnitude, we are not at liberty to accept the fact trier's findings merely because we consider them not "clearly erroneous" as that term is employed in Rule 52(a) F. R.Civ.P. We must make our own examination of the material from which decision is made. Feiner v. New York, 340 U.S. 315, 322–325, 71 S.Ct. 303, 95 L.Ed. 267 (1951) (Black, dissenting); Edwards v. South Carolina, 372 U.S. 229, 235, 83 S.Ct. 680, 9 L.Ed.2d 697 (1963); Jacobellis v. Ohio, 378 U.S. 184, 189, 84 S.Ct. 1676, 12 L.Ed.2d 793 (1964).

Obedient to that rule, we have made our own examination of the record before us and are persuaded that the factual findings of the District Judge are fully supported by the evidence and we agree with them.

The majority opinion in *Tinker* discusses the Fifth Circuit's decisions of Burnside v. Byars, 363 F.2d 744 (5th Cir. 1966) and Blackwell v. Issaquena County Bd. of Educ., 363 F.2d 749 (5th Cir. 1966). At first view, these cases appear to be "on all fours" with the case at bar. In the *Burnside* case, students were held, as an exercise of free speech, to be entitled to wear buttons with the legend "One Man, One Vote" around the perimeter and "SNCC" inscribed in the center, notwithstanding the school authorities' order to take them off. In that case, however, there had been no

previous rule of general application prohibiting the wearing of all buttons. Neither did the wearing of such buttons cause any disturbance at the time involved, nor had button wearing caused any past disturbances. In holding that the school authorities were required to allow the buttons, the Court said,

"Thus, it appears that the presence of 'freedom buttons' did not hamper the school in carrying on its regular schedule or activities; *nor would it seem likely that the simple wearing of buttons unaccompanied by improper conduct would ever do so.* Wearing buttons on collars or shirt fronts is certainly not in the class of those activities which inherently distract students and break down the regimentation of the classroom such as carrying banners, scattering leaflets, and speechmaking, all of which are protected methods of expressions, *but all of which have no place in an orderly classroom.* If the decorum had been so disturbed by the presence of the 'freedom buttons,' the principal would have been acting within his authority and the regulation forbidding the presence of buttons on school grounds would have been reasonable." 363 F. 2d at 748 (emphasis supplied).

In the *Blackwell* case, buttons were forbidden which evidently came from the same source as those in *Burnside*, but their legends consisted of the marginal position of SNCC and the depicting of a black and a white hand joined together. We find this legend not provocative, but its original appearance in the school and its wearing by many after the School Board had forbidden it caused quite serious commotion, in fact, "all hell broke loose." Students were suspended and they and their parents sought to have the school authorities enjoined from forbidding the wearing of the button. Here the Fifth Circuit sustained District Court denial of the injunction, notwithstanding its *Burnside* decision, announced the same day. It did so because the proofs showed that the *Blackwell* button caused trouble and the *Burn-*

*side* button did not. That the button was the cause of trouble in *Blackwell* is made clear by the Court's assertion, "In this case the reprehensible conduct described above was so inexorably tied to the wearing of the buttons that the two are not separable." 363 F.2d at 754. We can imagine no more cogent argument for Shaw's long standing and all-inclusive "no button" rule than the facts of *Burnside* and *Blackwell.*

The button in *Blackwell* was an invitation to friendship between the blacks and whites. What more non-controversial message could there be? But it caused serious trouble. Certainly the message of the *Guzick* button, supportive of a divisive demonstration, was more provocative than the *Blackwell* button's reach for friendship. Counsel for plaintiff's brief candidly asserts:

"There is rebelliousness among Shaw students. In January of 1969 a planned walkout of black students was aborted only when Drebus called in the police. In the aftermath Drebus and his staff interrogated three hundred black students. The denouement was a public statement issued by Drebus in which he said:

'We will take every positive action necessary to make sure that no organization or group of organizations, no teacher or group of teachers, no parents or group of parents, and no students or group of students hinder Shaw High pupils in their quest to obtain their purposeful goals and future opportunities.' "

In our view, the potentiality and the imminence of the admitted rebelliousness in the Shaw students support the wisdom of the no-symbol rule. Surely those charged with providing a place and atmosphere for educating young Americans should not have to fashion their disciplinary rules only after good order has been at least once demolished.

### 3. Conclusion.

We will not attempt extensive review of the many great decisions which have forbidden abridgment of free speech. We have been thrilled by their beautiful and impassioned language. They are part of our American heritage. None of these masterpieces, however, were composed or uttered to support the wearing of buttons in high school classrooms. We are not persuaded that enforcement of such a rule as Shaw High School's no-symbol proscription would have excited like judicial classics. Denying Shaw High School the right to enforce this small disciplinary rule could, and most likely would, impair the rights of its students to an education and the rights of its teachers to fulfill their responsibilities.

Mr. Justice Douglas spoke for a majority of the Court in Terminiello v. Chicago, 337 U.S. 1, 69 S.Ct. 894, 93 L.Ed. 1131 (1949) which had to do with utterances made at a public meeting in a Chicago auditorium. Describing the nature of free speech, he said:

"[A] function of free speech under our system of government is to invite dispute. It may indeed best serve its high purpose when it induces a condition of unrest, creates dissatisfaction with conditions as they are, or even stirs people to anger. Speech is often provocative and challenging. It may strike at prejudices and preconceptions and have profound unsettling effects as it presses for acceptance of an idea." 337 U.S. at 4, 69 S.Ct. at 896.

However correct such language when applied to an open public protest meeting, we doubt the propriety of protecting in a high school classroom such aggressive and colorful use of free speech. We must be aware in these contentious times that America's classrooms and their environs will lose their usefulness as places in which to educate our young people if pupils come to school wearing the badges of their respective disagreements, and provoke confrontations with their fellows and their teachers. The buttons are claimed to be a form of free speech. Unless they have some relevance to what is being considered or taught, a school

classroom is no place for the untrammeled exercise of such right.

All Courts and constitutional writers have emphasized the need for proper balancing in the exercise of the guarantees of the Constitution. In *Burnside, supra,* the Fifth Circuit observed:

> "The interest of the state in maintaining an educational system is a compelling one, giving rise to a *balancing of First Amendment rights* with the duty of the state to further and protect the public school system." 363 F.2d at 748 (Emphasis supplied).

In his monograph "The Supreme Court and the Meiklejohn Interpretation of the First Amendment," Mr. Justice William Brennan emphasized the propriety of this balancing:

> "The 'redeeming social value,' 'clear and present danger,' and 'balancing' tests recognize *some governmental power to inhibit speech,* but it must also be said that none of these limitations has been given an across-the-board application. Each has been primarily utilized to sustain governmental regulation in particular contexts: 'the redeeming social value' test primarily in obscenity cases; the 'clear and present danger' test primarily in regulation of subversive activity and of the publication of matter thought to obstruct justice; *and the 'balancing' test primarily in the case of regulations not intended directly to condemn the content of speech but incidentally limiting its exercise.*" 79 Harv.L.Rev. 1, 11 (1965). (Emphasis supplied.)

The complaint's contention that Guzick was denied equal protection of the law is not argued to this Court; neither is it now asserted that he was denied due process of law in the method by which the relevant discipline was imposed.

Judgment affirmed.

McALLISTER, Senior Circuit Judge (dissenting).

When a few students noticed the button which appellant was wearing, and asked him "what it said," appellant's explanation resulted only in a casual reaction; and there was no indication that the wearing of the button would disrupt the work and discipline of the school.

I am of the opinion that the judgment of the district court should be reversed and the case dismissed upon the authority of Tinker v. Des Moines Independent School District, 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969).