Joe Harold **WILLIAMS** et al., Plaintiffs-Appellants,

v.

Lloyd **EATON**, as Football Coach of the University of Wyoming, et al., Defendants-Appellees.

No. 72–1078.

United States Court of Appeals, Tenth Circuit.

Oct. 31, 1972.

C. Thomas Bastien, Denver, Colo. (David J. Hahn, Denver, Colo., on the brief), for plaintiffs-appellants.

Clarence A. Brimmer, Atty. Gen. of Wyo., Cheyenne, Wyo., for defendants-appellees.

Before HILL, SETH and HOLLO-WAY, Circuit Judges.

HOLLOWAY, Circuit Judge.

This appeal is a sequel to our earlier consideration of this controversy involving several Black athletes of the University of Wyoming football team. They were dismissed from the team following a dispute over their intentions to wear black armbands during a football game with Brigham Young University. After their dismissal they sought relief by this civil rights action, claiming violation of First Amendment rights.

In the prior appeal we affirmed in part, sustaining the dismissal of claims against the State of Wyoming and all damage claims, but reversed a summary judgment and dismissal of claims for equitable and declaratory relief as to other defendants, and remanded for further proceedings. 443 F.2d 422. After a trial to the court on these remaining claims for declaratory and injunctive relief, the trial court made findings of fact and conclusions of law in favor of the defendants and dismissed again. 333 F.Supp. 107. Essentially the court upheld the defendants' actions in dismissing the athletes from the team on the ground that the Federal and Wyoming Constitutions mandated complete neutrality on religious matters which would have been violated otherwise by the armband display expressing opposition to religious beliefs of the Church of Jesus Christ of Latter-Day Saints on racial matters.

The general circumstances of the controversy have been set out by the trial court and our earlier opinion and need not be repeated. We feel it important to discuss the facts in detail based on the trial record only in respect to two principal issues which will be treated.[1] We believe the controlling issues on this appeal are as follows:

(1) whether findings of fact 14 and 15 made by the trial court, dealing with the purpose of the athletes in seeking to wear the armbands and the position they took thereon, are clearly erroneous;

(2) whether the determination by the Board of Trustees of the University refusing to permit the athletes to wear the armbands on the field during the game was a reasonable and lawful ruling or regulation under the principles of Tinker v. Des Moines Independent School District, 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731, and similar cases.

We do not treat certain additional propositions forcefully argued for the athletes on this appeal. Arguments are made that the football coaching rule against participation generally by the athletes in demonstrations was invalid.

However, we feel that questions concerning the rule need not be decided. The original dismissal of the athletes by Coach Eaton for violation of the rule was not the end of the matter. Later the controversy was considered by the Trustees and President Carlson at a conference with the athletes and the athletic officials. It was found by the trial court that the decision of the Trustees to sustain the dismissal of the athletes was made after this conference during which the athletes insisted on the right to wear the armbands during the game. And it was further found that the Trustees' decision was made on the ground that permitting the wearing of the armbands would be in violation of the constitutional mandate requiring complete neutrality on religion.[2] Therefore our decision focuses on the lawfulness of the Trustees' action.

### Findings 14 and 15 and the purpose of the athletes in seeking to wear the armbands

The plaintiffs challenge findings 14 and 15 of the trial court, arguing that they are clearly erroneous under the test of United States v. United States Gypsum Co., 333 U.S. 364, 395, 68 S.Ct. 525, 92 L.Ed. 746.[3]

1. There is substantial discussion by both briefs on the question whether the plaintiffs would, in any event, be barred from reinstatement to the team by rules of the NCAA and the Western Athletic Conference. This question need not be decided in view of the conclusions we reach.

2. This conference was attended personally by the Governor, President Carlson and several Trustees. Except for two Trustees who were unavailable, the remaining Trustees participated by a telephone conference call arrangement which permitted them to hear the discussions and to express their views. At different times the plaintiffs, and also the Coach and the Athletic Director, discussed the matter with the Board. There is no claim by the plaintiffs that there was a denial of procedural due process in the various proceedings by the University officials or the Trustees.

3. Findings of fact 14 and 15 were as follows:

"14. That taking all of the evidence and facts adduced by the parties into consideration, the Court finds that there is no merit in the contention raised by the Plaintiffs in their complaint filed herein that one of the purposes of the black armband display was that of protesting against the alleged cheap shots and name-calling charged to members of the Brigham Young University football team; on the contrary, the Court finds that such allegation is without merit and that the sole and only purpose in the armband display was that of protesting against alleged religious beliefs of the Church of Jesus Christ of Latter-Day Saints, commonly known as the Mormon Church, and Brigham Young University, which the Plaintiffs considered one and the same, and the Court

The plaintiffs first challenge the portion of finding 14 that there is no merit in the contention that one of the purposes of the armband display was protesting against "cheap shots" and name-calling by members of the Brigham Young team. There was testimony by plaintiffs Williams and Hamilton that they were protesting against such conduct by the BYU team; Governor Hathaway and defendants Carlson and Hollon also said the plaintiffs did complain at the meeting with the Trustees about such conduct of the BYU players. However, plaintiffs Williams and Hamilton also said that at various meetings they were protesting against racial policies, Williams referring to such policies of BYU and Hamilton to those of the Mormon Church. And there was testimony by several defendants that centered on the demand of the athletes to wear the armbands in the game to protest views of the Mormon Church. Viewing the record as a whole we cannot agree with this challenge to the findings.

The plaintiffs also say that there was error in the portion of finding 14 that all of the plaintiffs refused to play against Brigham Young University unless they could wear the armbands. And they argue also that finding 15 was in error in stating that all of the plaintiffs refused to play again for the University if defendant Eaton remained as coach. They say the proof fails to establish these facts as to all of the individual plaintiffs and that there was contrary proof. The evidence was in conflict. There was, however, testimony by Governor Hathaway and President Carlson about the discussions and conduct of the plaintiffs at the meeting which Governor Hathaway and President Carlson had separately with them which supports these findings. Defendant Pence's testimony also supports these findings.

■ The plaintiffs contend that we must make our own examination of the record and that we are not at liberty to accept the findings on such constitutional issues merely because we consider them not clearly erroneous. They rely on Guzick v. Drebus, 431 F.2d 594, 599 (6th Cir.), cert. denied, 401 U.S. 948, 91 S.Ct. 941, 28 L.Ed.2d 231. We are required of course to consider the record ourselves when findings of fact of the trial court are challenged. However, we have not treated findings made in cases involving constitutional rights differently from those in other civil cases. See e. g., Keyes v. School District No. 1, Denver, Colorado, 445 F.2d 990, 999, 1000 (10th Cir.), cert. granted, 404 U.S. 1036, 92 S.Ct. 707, 30 L.Ed.2d 728; Linebarger v. State of Oklahoma, 404 F.2d 1092 (10th Cir.), cert. denied, 394 U.S. 938, 89 S.Ct. 1218, 22 L.Ed.2d 470; Caldwell v. United States, 435 F.2d 1079 (10th Cir.); Brown v. Crouse, 425 F.2d 305 (10th Cir.); Carpenter v. Crouse, 389 F.2d 53 (10th Cir.).[4]

further finds that each of the Plaintiff football players refused to participate in the football game with Brigham Young University as members of the football team of the University of Wyoming unless they were permitted to demonstrate against the religious beliefs of the Mormon Church by wearing black armbands upon the playing field.

"15. That, taking all of the evidence and facts adduced by the parties into consideration, the Court finds that each of the Plaintiffs refused to play football as a member of the University of Wyoming football team unless and until the Defendant, Lloyd Eaton, was removed from his position as Head Football Coach of the Universty of Wyoming."

4. In some cases the Supreme Court has, of course, reviewed the record where constitutional rights were involved, reaching a conclusion different from that of a state court where there was compelling evidence of a constitutional wrong. See Edwards v. South Carolina, 372 U.S. 229, 235, 83 S.Ct. 680, 9 L.Ed.2d 697; Blackburn v. Alabama, 361 U.S. 199, 209, 80 S.Ct. 274, 4 L.Ed.2d 242. We cannot agree that such cases indicate that we should depart from Rule 52 standards in reviewing findings on a record such as this.

We believe that the test of Rule 52, F.R.Civ.P., applies here. "The question for the appellate court under Rule 52(a) is not whether it would have made the findings the trial court did, but whether 'on the entire evidence [it] is left with the definite and firm conviction that a mistake has been committed.'" Zenith Corp. v. Hazeltine, 395 U.S. 100, 123, 89 S.Ct. 1562, 1576, 23 L. Ed.2d 129. The weighing of the conflicting evidence and the credibility of witnesses was for the trial court, and its findings will not be disturbed unless they are clearly erroneous. Rule 52(a) F.R.Civ.P.; Linebarger v. State of Oklahoma, supra at 1094, 89 S.Ct. 1218. We are satisfied that the record supports the challenged findings and that they are not clearly erroneous.

### First Amendment principles under Tinker v. Des Moines Independent School District

Both plaintiffs and defendants rely on the principles stated in the Tinker case and similar decisions. The plaintiffs argue that they come within its bounds of freedom of expression recognized therein as applying to students in different places, including the playing field. 393 U.S. at 512, 513, 89 S.Ct. 733. On the other hand the defendants say that their actions were within the exceptions stated in the opinion. We feel the controlling guidelines from the Tinker case are the following:

"A student's rights, therefore, do not embrace merely the classroom hours. When he is in the cafeteria, or on the playing field, or on the campus during the authorized hours, he may express his opinion, even on controversial subjects like the conflict in Vietnam, if he does so without 'materially and substantially interfer[ing] with the requirements of appropriate discipline in the operation of the school' and without colliding with the rights of others. * * * But conduct by the student, in class or out of it, which for any reason—whether it stems from time, place, or type of behavior —materially disrupts class work or involves substantial disorder or invasion of the rights of others is, of course, not immunized by the constitutional guarantee of freedom of speech. * * * * "

* * * * * *

". . . The Constitution says that Congress (and the States) may not abridge the right to free speech. This provision means what it says. We properly read it to permit reasonable regulation of speech-connected activities in carefully restricted circumstances. But we do not confine the permissible exercise of First Amendment rights to a telephone booth or the four corners of a pamphlet, or to supervised and ordained discussion in a school classroom." [citations omitted]

393 U.S. at 512, 513, 89 S.Ct. at 740.

The trial court concluded that had the defendants, as governing officials of the University of Wyoming, permitted display of the armbands, their actions would have been violative of the First Amendment establishment clause and its requirement of neutrality on expressions relating to religion, citing School District of Abington v. Schempp, 374 U.S. 203, 83 S.Ct. 1560, 10 L.Ed.2d 844, and similar cases. The Court further grounded its conclusions on the provisions of the Wyoming Constitution guaranteeing the free exercise and enjoyment of religion and worship without discrimination or preference.

". . . The government is neutral, and, while protecting all [religious opinions and sects], it prefers none, and it disparages none." Id. at 215, 83 S.Ct. at 1567. Thus stemming from state and federal law there is strong support for a policy restricting hostile expressions against religious beliefs of others by representatives of a state or its agencies. We feel that the Trustees' decision was a proper means of respecting the rights of others in their beliefs, in ac-

cordance with this policy of religious neutrality.

██ The plaintiffs vigorously deny that there would have been state action or a violation of the First Amendment principles on religion by permitting the armband display. Without deciding whether approval of the armband display would have involved state action or a violation of the religion clauses, we are persuaded that the Trustees' decision was lawful within the limitations of the *Tinker* case itself. Their decision protected against invasion of the rights of others by avoiding a hostile expression to them by some members of the University team. It was in furtherance of the policy of religious neutrality by the State. It denied only the request for the armband display by some members of the team, on the field and during the game. In these limited circumstances we conclude that the Trustees' decision was in conformity with the *Tinker* case and did not violate the First Amendment right of expression of the plaintiffs. See Sword v. Fox, 446 F.2d 1091, 1097, 1098 (4th Cir.), cert. denied, 404 U.S. 994, 92 S.Ct. 534, 30 L.Ed.2d 547.

We do not base our holding on the presence of any violence or disruption. There was no showing or finding to that effect and the trial court's conclusions of law state that the denial of the right to wear the armbands during the game " . . . was not predicated upon the likelihood of disruption, although such a demonstration might have tended to create disruption." Instead the trial court referred only to the mandate of complete neutrality in religion and religious matters as the basis for the court's ruling.

We hold that the trial court's findings and this record sustain the Trustees' decision as lawful, made for the reasons found by the trial court, as a reasonable regulation of expression under the limited circumstances involved, ·in accord with the principles of the *Tinker* case on free speech.

Affirmed.