Mary E. HAUSCH, Plaintiff,

v.

DONREY OF NEVADA, INC., d/b/a Las Vegas Review–Journal; Donrey, Inc., d/b/a Las Vegas Review–Journal; Does I–X, inclusive, Defendants.

No. CV–S–93–432–PMP (LRL).

United States District Court, D. Nevada.

Sept. 20, 1993.

Kathleen J. England and Kristina S. Holman, Combs & England, Las Vegas, NV, for plaintiff.

Carol Davis Zucker, Beckley, Singleton, Delanoy, Jemison & List, Las Vegas, NV, David M. Olive, Donrey Media Group, Ft. Smith, AR, and Edith N. Dinneen, Lane Powell Spears Lubersky, Los Angeles, CA, for defendants.

## ORDER

PRO, District Judge.

This case calls for the Court to decide whether Plaintiff's claim that she was subjected to sex discrimination when denied promotion to the position of Editor of Defendant's newspaper is barred as a matter of law by the First Amendment to the United States Constitution.

### I. FACTS

Defendant Donrey is the owner and publisher of the Las Vegas Review–Journal, which is the largest newspaper in the Donrey Media Group of 52 daily newspapers and the largest newspaper in Nevada with a daily circulation of approximately 145,000 and a Sunday circulation of approximately 205,000. Plaintiff Mary E. Hausch ("Hausch") com-

menced employment with Defendant Donrey in various capacities in the editorial department at the Review–Journal on October 4, 1971. In 1978, Hausch was promoted to the position of "Managing Editor," and from time to time beginning in 1980, she was given the responsibilities of "Editor" when the Editor was absent.

On August 25, 1988, the Editor position for the Review–Journal became vacant. Hausch applied for the position of Editor on August 26, 1988, but was never interviewed for the job. Instead, according to Hausch, Defendants hired Sherman Frederick as Editor in August of 1988. Hausch was officially notified that she would not receive the job on September 7, 1988. Hausch alleges that at the time Defendants hired Frederick, he had less management experience and fewer professional credentials than she did.

Hausch further alleges that on September 7, 1988, Defendants claimed to "promote" her to the position of "Associate Editor," a position she contends was newly created, and one that she alleges is not the customary title in the newspaper industry for the second-in-command of a news department. Hausch further maintains that despite this alleged promotion, Defendants "slowly and systematically" divested her of many responsibilities at the Review–Journal.

In February, 1989, Defendants hired Tom Mitchell to replace Hausch as Managing Editor. The opening at Managing Editor was created by Hausch's "promotion" to Associate Editor. Hausch's Complaint alleges that Defendants paid Mitchell over $5,000.00 per year more than they paid Hausch when she was employed as Managing Editor. Hausch further contends that at the time Mitchell became Managing Editor, he had less experience and fewer qualifications than Hausch.

Hausch filed a complaint with the Nevada Equal Rights Commission ("NERC") on March 2, 1989 ("Charge 1"). After Defendants allegedly retaliated against her, Hausch filed a second complaint with NERC and the Equal Employment Opportunity Commission ("EEOC") on September 4, 1990 ("Charge 2").

On November 20, 1990, Defendants suspended Hausch from her position as Associate Editor. On November 27, 1990, Hausch filed an amendment to Charge 2, referred to as the "Amended Retaliation Charge." On February 4, 1991, Defendants terminated Hausch from employment with the Review–Journal, allegedly in retaliation for filing her charges of discrimination. On February 20, 1991, Hausch filed further amendments to Charge 2, referred to as "Further Amended Retaliation Charge."

On April 19, 1991, NERC issued a finding that there was probable cause to believe that Hausch was the victim of sex discrimination when she was denied the position of Editor. NERC referred this case to the EEOC for further processing.

On February 16, 1993, the EEOC issued a finding that Hausch was the victim of discrimination when she was denied the promotion to Editor, when Defendants retaliated against her by subjecting her to adverse employment conditions, and when Defendants retaliated against her by suspending her and then firing her.

On May 10, 1993, Hausch commenced this action with a Complaint pursuant to the Civil Rights Act of 1964 ("Title VII"), as amended, 42 U.S.C. § 2000e et seq.; the Civil Rights Act of 1991, Pub.L. No. 102–166, 105 Stat. 1071 (1991), ("1991 Civil Rights Act"); the Equal Pay Act of 1963, 29 U.S.C. § 206; and N.R.S. 613.310 et seq.

Hausch's Complaint sets forth seven claims for relief. The First claim for relief alleges sex discrimination under federal statute. The Second claim for relief alleges retaliation under federal statute. The Third claim for relief alleges sex discrimination under state statute. The Fourth claim for relief alleges tortious discharge. The Fifth claim seeks injunctive relief under federal statute. The Sixth claim seeks relief under the Equal Pay Act, and Plaintiff's Seventh claim seeks punitive and exemplary damages.

Before the Court for consideration are two Motions. On July 9, 1993, Defendants filed a Motion for Summary Judgment regarding Plaintiff's First, Second, Third, Fifth and Seventh claims for relief. Hausch filed an

Opposition (# 34) on August 26, 1993, and Defendants filed a Reply (# 37) on September 10, 1993. Additionally, on August 12, 1993, Hausch filed a Motion for Continuance or in the Alternative, for Denial of Defendants' Motion for Summary Judgment (# 33), to which Defendants Responded (# 35) on August 27, 1993, and Hausch Replied (# 36) on September 1, 1993.

In their Summary Judgment Motion, Defendants argue that applying Title VII to their newspaper business would, as a matter of law, violate their First Amendment rights.[1] In Hausch's Motion for Continuance, as well as in her Opposition to Defendants' Summary Judgment Motion, Hausch asserts that she needs more time to complete discovery in order to properly develop the facts underlying her sex discrimination claim. This Court finds, however, that no additional facts are needed in order to adjudicate Defendants' First Amendment argument. Before considering the issue of whether Defendants violated Title VII, the Court must decide whether Title VII may be applied to Defendants.

## II. SUMMARY JUDGMENT

Pursuant to Federal Rule of Civil Procedure 56, summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."

■ The party moving for summary judgment has the initial burden of showing the absence of a genuine issue of material fact. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); *Zoslaw v. MCA Distrib. Corp.*, 693 F.2d 870, 883 (9th Cir.1982). Once the movant's burden is met by presenting evidence which, if uncontroverted, would entitle the movant to a directed verdict at trial, the burden then shifts to the respondent to set forth specific facts demonstrating that there is a genuine issue for trial. *Anderson v.*

*Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). If the factual context makes the respondent's claim implausible, that party must come forward with more persuasive evidence than would otherwise be necessary to show that there is a genuine issue for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986); *California Arch. Bldg. Prod. v. Franciscan Ceramics*, 818 F.2d 1466, 1468 (9th Cir.1987), *cert. denied*, 484 U.S. 1006, 108 S.Ct. 698, 699, 98 L.Ed.2d 650 (1988).

■ If the party seeking summary judgment meets this burden, then summary judgment will be granted unless there is significant probative evidence tending to support the opponent's legal theory. *First National Bank of Arizona v. Cities Service Co.*, 391 U.S. 253, 290, 88 S.Ct. 1575, 1593, 20 L.Ed.2d 569 (1968); *Commodity Futures Trading Comm'n v. Savage,* 611 F.2d 270 (9th Cir. 1979). Parties seeking to defeat summary judgment cannot stand on their pleadings once the movant has submitted affidavits or other similar materials. Affidavits that do not affirmatively demonstrate personal knowledge are insufficient. *British Airways Bd. v. Boeing Co.*, 585 F.2d 946, 952 (9th Cir.1978), *cert. denied*, 440 U.S. 981, 99 S.Ct. 1790, 60 L.Ed.2d 241 (1979). Likewise, "legal memoranda and oral argument are not evidence and do not create issues of fact capable of defeating an otherwise valid motion for summary judgment." *Id.*

■ A material issue of fact is one that affects the outcome of the litigation and requires a trial to resolve the differing versions of the truth. *See Admiralty Fund v. Hugh Johnson & Co.*, 677 F.2d 1301, 1305–06 (9th Cir.1982); *Admiralty Fund v. Jones*, 677 F.2d 1289, 1293 (9th Cir.1982).

■ All facts and inferences drawn must be viewed in the light most favorable to

---

1. In this respect, Defendants' Motion for Summary Judgment is more properly considered as a Motion to Dismiss, as they argue that even if Plaintiff's version of the facts is true, Title VII provides no remedy against them.

the responding party when determining whether a genuine issue of material fact exists for summary judgment purposes. *Poller v. CBS, Inc.*, 368 U.S. 464, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962). After drawing inferences favorable to the respondent, summary judgment will be granted only if all reasonable inferences defeat the respondent's claims. *Admiralty Fund v. Tabor*, 677 F.2d 1297, 1298 (9th Cir.1982).

The trilogy of Supreme Court cases cited above establishes that "[s]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'" *Celotex Corp.*, 477 U.S. at 327, 106 S.Ct. at 2555 (quoting Fed.R.Civ.P. 1). *See also Avia Group Int'l, Inc. v. L.A. Gear Cal.*, 853 F.2d 1557, 1560 (Fed.Cir.1988).

## III. APPLICATION OF TITLE VII

■ Defendants argue that they are entitled to judgment as a matter of law, because application of Title VII in this case would violate their First Amendment rights.[2] Defendants contend that "the choice of the leaders who exercise a publisher's editorial discretion ... should be protected from governmental intrusion." Defendant's Motion for Summary Judgment (# 19) at 8. They further argue that the process of editorial control is protected by the First Amendment, and that "no decision is more crucial to the process of editorial control and judgment than the choice of the key managers to exercise that control and judgment." *Id.* at 11.

Defendants assert that if the United States Government, through the judiciary's application of Title VII, may exercise control over who the publisher may choose as editor or associate editor, then the Government is exercising control over the content of that publication. Defendants state that "as a means of expressing the publisher's views and determining the content of its publication, free-

dom to [determine who will be responsible for editorial control] is crucial to fulfillment of the First Amendment's guarantee of a free and independent press." Defendants argue that "the First Amendment, therefore, limits governmental intrusion—including judicial scrutiny under Title VII—into Donrey's employment decision-making process at the editorial level." *Id.* at 15.

Defendants acknowledge that the First Amendment "does not shield every business or personnel decision made by a publisher," but argue that it does insulate a publisher from governmental intrusion into decisions that affect the publisher's *editorial* functions. Defendants analogize the issues presented by this case to cases which have decided that the Religion Clauses in the United States Constitution preclude application of the National Labor Relations Act ("NLRA") to teachers in church-operated schools, and to cases which have held that the Religion Clauses preclude application of Title VII to members of the Clergy. Defendants conclude that "exemption from Title VII should be mandated whenever a managerial employee exercises editorial control and judgment over the content of a newspaper," and that "Donrey should be entitled to exercise its discretion to alter or terminate the employment of an Associate Editor without governmental inquiry into the motives underlying its decision." *Id.* at 25.

Hausch responds that application of Title VII would not violate Defendants' First Amendment rights. Hausch asserts that there is no authority precluding application of Title VII to newspapers or to the media in general, and that applying Title VII to a newspaper does not constitute governmental control over the content of such a publication. Finally, Hausch disputes the applicability of the cases cited by Defendants which consider Title VII and other statutes in a religious context, and contends that a recent United States Supreme Court case, *University of Pennsylvania v. Equal Employment Opportunity Commission*, 493 U.S. 182, 110 S.Ct.

---

**2.** Plaintiff's Complaint states a cause of action under the Nevada anti-discrimination statute, N.R.S. 613.330. For purposes of this Order, all discrimination claims will be referred to as arising under Title VII. Furthermore, as Defendants admit, this Summary Judgment Motion does not affect Plaintiff's Equal Pay claim, assuming she chooses to amend her Complaint to more properly state such a claim pursuant to this Court's Order (# 32) entered August 11, 1993.

577, 107 L.Ed.2d 571 (1990), in which the Court held that the First Amendment did not preclude the applicability of Title VII to the tenure process at a private university, is the case most analogous to the one before this Court.

The precise issue before the Court is whether Title VII's prohibition on discrimination in hiring and firing may be applied to high ranking newspaper employees with editorial decision-making responsibilities over the content of the newspaper, or whether the First Amendment renders the application of Title VII to such employees unconstitutional. After a careful review of both Constitutional and Title VII case law, this Court agrees with the parties that the issue presented by Defendants' Summary Judgment Motion appears to be one of first impression.

Defendants urge this Court to follow the analysis found in cases that have interpreted Title VII as it is applied in the context of religious employment. For example, the Fifth Circuit in *McClure v. Salvation Army*, 460 F.2d 553 (5th Cir.), *cert. denied*, 409 U.S. 896, 93 S.Ct. 132, 34 L.Ed.2d 153 (1972), held that Title VII does not apply to a church (the employer) and the church's minister, because to apply Title VII to such an employee might result in a violation of the Free Exercise clause. *See also Rayburn v. General Conference of Seventh–Day Adventists*, 772 F.2d 1164 (4th Cir.1985), *cert. denied*, 478 U.S. 1020, 106 S.Ct. 3333, 92 L.Ed.2d 739 (1986) (holding that Title VII impermissibly burdens the Free Exercise rights of a church to choose its ministers, that no compelling governmental interest overrides that burden, and that in deciding whether Title VII should

be applied to a particular church employee, courts must ascertain whether that employee's position is important to the spiritual and pastoral mission of the church).

In similar cases, the Ninth Circuit has held that the Free Exercise and Establishment Clauses in the First Amendment do not preclude application of Title VII to a religious school's policy of applying health insurance benefits to only "head of household" employees. *See Equal Employment Opportunity Commission v. Fremont Christian School*, 781 F.2d 1362 (9th Cir.1986); *see also Equal Employment Opportunity Commission v. Pacific Press Pub. Ass'n*, 676 F.2d 1272 (9th Cir.1982) (holding that the Establishment and Free Exercise Clauses do not prohibit the application of Title VII to a female employee of a nonprofit religious publishing house).

■■■ This Court finds that consideration of whether Title VII should be applied to religious employers is a question of such a different character from the issue presented here as to render inapplicable the analysis of the cases cited by Defendants and discussed above.[3] Cases involving alleged violations of the freedoms of speech and press are analyzed under a different constitutional rubric than are cases involving potential Religion Clause violations. *See, e.g., Buckley v. Valeo*, 424 U.S. 1, 93 n. 127, 96 S.Ct. 612, 670 n. 127, 46 L.Ed.2d 659 (1976); Ronald B. Turovsky, Note, *Heffron v. International Society for Krishna Consciousness, Inc.: Confusing Free Speech with Free Exercise Rights*, 71 Calif.L.Rev. 1012, 1017 (1983). Potential abridgment of free speech is tested by deter-

---

**3.** In *Rayburn, Fremont*, and *Pacific Press*, the courts were cognizant that the law requires construction of Title VII to avoid reaching constitutional questions. In *McClure*, the Court avoided the constitutional question by interpreting Title VII not to apply.

In *Rayburn, Fremont*, and *Pacific Press*, the courts were forced to conclude that the application of Title VII in those cases gave rise to serious constitutional questions. Following Supreme Court precedent, the courts, given the potential for "serious constitutional questions," then ascertained whether Congress affirmatively intended Title VII to apply to the employees in those cases. Only after finding that Congress specifically intended Title VII's protections to

apply did the courts reach the constitutional questions and find that application of Title VII did or did not violate the Free Exercise or Establishment Clauses in the First Amendment.

Defendants argue that this Court should find that serious constitutional questions are raised by the potential application of Title VII to highly ranked newspaper employees; that there is little or no evidence that Congress specifically intended Title VII to apply to such employees; and that in the absence of such Congressional intent, the Court should avoid reaching the Constitutional issues by holding that Title VII does not apply. *See, e.g., National Relations Labor Board v. Catholic Bishop of Chicago*, 440 U.S. 490, 99 S.Ct. 1313, 59 L.Ed.2d 533 (1978).

mining whether the Government has a compelling interest in the contested regulation or restriction, and whether that regulation is narrowly drawn. *See generally Sable Communication of California, Inc. v. FCC*, 492 U.S. 115, 126, 109 S.Ct. 2829, 2836, 106 L.Ed.2d 93 (1989). Cases testing the constitutionality of regulations alleged to violate the Free Exercise clause do so using a three-factor test, and cases examining the validity of regulations that allegedly violate the Establishment Clause utilize a wholly different three-part test.[4] *See Pacific Press*, 676 F.2d at 1279–81. Thus, whether a regulation burdens free speech rights is a question that requires analysis specific to the First Amendment's Speech or Press Clause, and this determination is not controlled or necessarily guided by cases analyzing the Religion Clauses.

Defendants recognize that the Religion Clause cases stand for the proposition that employees of a church or church-related employer who are not intimately involved with the religious aspect of the church are protected by Title VII, but that Title VII does not apply to clergy or ministers, because the right of a church to choose its own ministers cannot be subjected to governmental scrutiny without violating the Constitution. Defendants urge this Court to equate the functions of a religious minister and a newspaper editor, and to draw the analogy that just as ministers are responsible for setting a church's religious tone and policies and for determining the content of the church's religious message, editors are responsible for setting the newspaper's tone and policies, and determining the newspaper's content.

The Court rejects the analogy proffered by Defendants.

In order to support Defendants' argument, the relationships that must be equated are not merely those of minister to newspaper editor, but also the relationship of each to the applicable Constitutional Amendment. Thus, Defendants' analogy would require this Court to equate the relationship between a minister and the protection afforded to that minister by the Religion Clauses, with the relationship between a newspaper editor and the protection afforded to that editor by the Speech and Press Clauses.[5] Pertinent case law does not support this equation.

Defendants also call this Court's attention to cases which have considered constitutional challenges to the National Labor Relations Act. For example, the D.C. Circuit in *Passaic Daily News v. N.L.R.B.*, 736 F.2d 1543 (D.C.Cir.1984), held that it was an unconstitutional burden on the First Amendment rights of the newspaper for the National Labor Relations Board, in fashioning a remedy for a NLRA violation, to compel the newspaper to resume publication of a columnist's weekly column. In another D.C. Circuit opinion, *Newspaper Guild of Greater Philadelphia, Local 10 v. N.L.R.B.*, 636 F.2d 550 (D.C.Cir.1980), the court held that the NLRA could not compel the newspaper to bargain on the subject of certain rules the newspaper had adopted to govern the behavior of the paper's employees, which according to the court were "designed to prevent its employees from engaging in activities which may directly compromise their standing as responsible journalists and that of the publica-

---

4. Courts examining a Free Exercise question must weigh:

> (1) the magnitude of the statute's impact on the exercise of the religious belief; (2) the existence of a compelling state interest justifying the burden imposed upon the exercise of the religious belief; and (3) the extent to which recognition of an exemption from the statute would impede the objectives sought to be advanced by the state.

*Pacific Press*, 676 F.2d at 1279.

Courts analyzing an Establishment Clause claim test the alleged violation by asking:

> (1) whether the statute in question has a secular purpose, (2) whether the primary effect of the statute advances or inhibits religion, and

> (3) whether the statute fosters excessive government entanglement with religion.

*Id.* at 1281 (citing *Lemon v. Kurtzman*, 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971)).

5. Defendants ask this Court to extend the same protection afforded to religious ministers by the Constitution to newspaper editors, because ministers and editors share similar types of functions. The impropriety of this analogy becomes apparent when one examines the Constitutional *source* of the minister's protection. The source of the minister's protection from the application of Title VII is in the Religion Clauses of the First Amendment. Defendants do not argue, nor could they, that editors are likewise protected by the Religion Clauses.

tion for which they work as a medium of integrity." *Id.* at 561. Defendants also cite to *NLRB v. Yeshiva University,* 444 U.S. 672, 100 S.Ct. 856, 63 L.Ed.2d 115 (1980), in which the Court held that full-time faculty members of Yeshiva University were not "employees" within the meaning of the NLRA because the Court found that the employees were "managerial" employees, not within the scope of the NLRA. Although Defendants recognize that the Supreme Court's decision in *Associated Press v. Labor Bd.,* 301 U.S. 103, 57 S.Ct. 650, 81 L.Ed. 953 (1937), held that the NLRA applied to a nonmanagerial newsroom employee of the Associated Press, they argue that the Court was not considering the NLRA in the context of an editorial or managerial employee.[6]

These cases do not support Defendants' arguments. In both *Associated Press* and *Yeshiva University,* the question before the Court was whether the NLRA covered the particular type of employee at issue in those cases, as the term "employee" is defined in the NLRA. The instant case provides this Court with no similar statutory interpretation. In *Greater Philadelphia,* the court found that "protection of the editorial integrity of a newspaper lies at the core of publishing control," and that "with respect to most news publications, credibility is central to their ultimate product." *Greater Philadelphia,* 636 F.2d at 560. Thus, the court found that reasonable regulations adopted by the newspaper to safeguard its credibility were beyond the scope of the NLRA, and that the NLRB could not force the paper to bargain on these regulations. Defendants have made no allegations that their ability to control the integrity or credibility of their publication is affected by Title VII.

Indeed, this Court finds that *Associated Press* and *Passaic Daily News* support Plaintiff's position in the instant case. The *Associated Press* Court rejected the news company's argument that "any regulation protective of union activities, or the right collectively to bargain on the part of such employees, is necessarily an invalid invasion of the freedom of the press." *Associated Press,* 301 U.S. at 131, 57 S.Ct. at 655. Furthermore, the Court characterized as an "unsound generalization" the Associated Press' conclusion that "whatever may be the case with respect to employees in its mechanical departments, [the Associated Press] must have absolute and unrestricted freedom to employ and to discharge those who, like Watson, edit the news, ..."

Thus, the *Associated Press* Court took two important actions relevant to this case. First, it recognized the distinction between employees who exercise managerial control and discretion, and those who do not. Second, it applied the NLRA to those managerial employees. Although the Associated Press had claimed it fired Watson for bias and partiality in his news reporting, the Court noted that the "actual reason for his discharge ... was his Guild activity and his agitation for collective bargaining." *Id.* at 132, 57 S.Ct. at 655. The Court applied the NLRA to Watson, holding that although "the statute does not preclude a discharge on the ostensible grounds for the Petitioner's [Associated Press] action; it forbids discharge for what has been found to be the real motive of the [Associated Press]." *Id.* In a comment especially relevant to the case at bar, the Court stated:

> The act does not compel the petitioner [Associated Press] to employ anyone; it does not require that the petitioner retain in its employ an incompetent editor or one who fails faithfully to edit the news to reflect the facts without bias or prejudice. The act permits a discharge for any reason other than union activity or agitation for collective bargaining with employees. The restoration of Watson to his former position in no sense guarantees his continuance in petitioner's employ. The petitioner is at liberty, whenever occasion may arise, to exercise its undoubted right to sever his

---

6. This Court does not so readily agree with Defendants' characterization of the nature of the employee's position in *Associated Press.* The Supreme Court noted that the employee, Watson, was responsible for receiving, rewriting, and filing for transmission news that had come into the

Associated Press' office, and that "the function of editors and editorial employees such as Watson is to determine the news value of items received and speedily and accurately to rewrite the copy delivered to them ..." *Associated Press,* 301 U.S. at 127, 57 S.Ct. at 653.

relationship for any cause that seems to it proper save only as a punishment for, or discouragement of, such activities as the act declares permissible.

*Id.* at 132, 57 S.Ct. at 655. Thus, the Court held that application of the NLRA to an employee with editorial-type functions did not violate the First Amendment.[7]

Defendants also rely heavily on *Miami Herald Publishing Co. v. Tornillo,* 418 U.S. 241, 94 S.Ct. 2831, 41 L.Ed.2d 730 (1973). They assert that in *Tornillo,* the Supreme Court prohibited Government intrusion into a publisher's exercise of editorial discretion. The Court in *Tornillo* struck down a Florida statute that provided a candidate whose personal character or official record was assailed by a newspaper with a "right of reply," in which the candidate could demand that the newspaper print any reply the candidate desired to make in refuting the paper's charges. Failure to comply with the statute was made a first-degree misdemeanor. The Court struck the statute down as a violation of the newspaper's First Amendment rights, because it found that the statute compelled editors and publishers to publish certain materials, that the statute exacted penalties based on the content of the newspaper, and that the statute could easily have the effect of forcing editors to choose between having to print candidates' replies or foregoing political comment, thus resulting in the stifling of political and electoral coverage. The Court concluded:

> The choice of material to go into a newspaper, and the decisions made as to limitation on the size and content of the paper, and treatment of public issues and public officials—whether fair or unfair—constitute the exercise of editorial control and judg-

ment. It has yet to be demonstrated how governmental regulation of this crucial process can be exercised consistent with First Amendment guarantees of a fee press as they have evolved to this time.

*Tornillo,* 418 U.S. at 258, 94 S.Ct. at 2840.

This Court finds *Tornillo* easily distinguishable from the issue presented in this case. The Court in *Tornillo* was faced with a statute that compelled editors and publishers to publish certain specific material, i.e. replies from politicians who had been subjected to a newspaper's criticism. The *Tornillo* Court concluded that the statute regulated content, because it required the publication of certain specific material. Here, application of Title VII in no way requires the newspaper to publish any material it does not wish to publish.[8] Thus, Title VII, as applied to Defendants, does not regulate content.

This Court is aware of only one case that has considered the application of Title VII in a First Amendment freedom of speech context. Although not identical to the case at bar, *University of Pennsylvania v. E.E.O.C.,* 493 U.S. 182, 110 S.Ct. 577, 107 L.Ed.2d 571 (1990), contains a helpful analysis of the interplay between Title VII and the First Amendment.

In 1985, the University of Pennsylvania, a private institution, denied tenure to Rosalie Tung. Ms. Tung filed a charge of discrimination based on race, sex, and national origin with the EEOC. The EEOC began its investigation into Ms. Tung's claims, and in order to facilitate its investigation, it requested via subpoena that the University provide it with materials. Included among these subpoenaed materials were certain letters written

---

7. *Passaic Daily News* also supports Plaintiff's position. There, the court, citing *Associated Press,* held that the First Amendment did not prevent inspection of the motives of the newspaper, and did not preclude the NLRB from challenging the newspaper's decision to terminate the columnist and to discontinue publication of his column. Thus, once the Board's General Counsel established a prima facie case that the newspaper committed an unfair labor practice, the newspaper would then be required to explain its decision and to show that its explanation was not merely pretextual. The court did hold that it would violate the newspaper's First Amendment

rights to compel the newspaper to resume publication of the terminated columnist's column, but this was a constitutional infirmity in the remedial action ordered by the Board, and was not a finding that the First Amendment precluded inquiry into whether the newspaper had violated the NLRA.

8. *Defendants' argument that Title VII necessarily determines the content of what it publishes by requiring it not to use sex, race, or the other criteria prohibited by Title VII in the selection of its editor is considered infra.*

by Ms. Tung's evaluators, a letter of evaluation from the department chairman, documents reflecting internal deliberations of various faculty committees, and similar types of documents used in reviewing applications from five male tenure applicants who Ms. Tung alleged had received more favorable treatment.

The University requested modification of the subpoena to allow it to withhold this "confidential peer review information," and when the EEOC refused to modify its subpoena, the University refused to provide the EEOC with the requested materials. In response, the EEOC applied for and received an Enforcement Order from the United States District Court for the Eastern District of Pennsylvania. The Third Circuit upheld the Enforcement Order, and the Supreme Court granted certiorari to determine "whether a university enjoys a special privilege, grounded in either the common law or the First Amendment, against disclosure of peer review materials that are relevant to charges of racial or sexual discrimination." *University of Pennsylvania*, 493 U.S. at 184, 110 S.Ct. at 579.

The Court began its First Amendment analysis by noting that the University claimed it had a right of "academic freedom," grounded in the First Amendment. The University claimed that requiring disclosure of this confidential peer review material would undermine the existing process of awarding tenure, and would thereby result in a significant infringement of its First Amendment right of academic freedom. *Id.* at 197, 110 S.Ct. at 586. The University cited other potential problems with requiring the disclosure, including a chilling effect on candid evaluations, decreased ability to rely on tenure committee evaluations because of a reluctance of the evaluators to be frank in their evaluations, divisiveness, tension, and strain on and among faculty, and impairing "the free interchange of ideas that is a hallmark of academic freedom." *Id.*

The Court distinguished the cases cited by the University to support its asserted First Amendment right to academic freedom by noting that the cases the University cited dealt with government's attempt to control or direct the *content* of speech engaged in by universities or those affiliated with them. The Court noted that the University did not claim that enforcement of the EEOC subpoenas were intended to or in fact would direct the content of University discourse toward or away from particular subjects or points of view. Thus, the Court in *University of Pennsylvania* was able to avoid reaching the question of whether enforcement of Title VII in the context of faculty selection constituted a governmental attempt to influence the content of speech. Having avoided this question, it of course was able to avoid deciding whether enforcement of Title VII in this context was a permissible or an impermissible infringement on the First Amendment.

In addition to noting that the burden imposed by compliance with the EEOC subpoenas was not content-based, the *University of Pennsylvania* Court stated that the cases relied upon by the University dealt with "direct" infringements on an asserted right to determine on academic grounds who may teach. The Court noted that "the [EEOC] is not providing criteria that [the University] must use in selecting teachers. Nor is it preventing the University from using any criteria it may wish to use, except those— including race, sex, and national origin—that are proscribed under Title VII." *Id.* at 198–99, 110 S.Ct. at 587.

Having determined that the application of Title VII was neither a direct nor a content-based burden, the Court nevertheless noted that the absence of direct or content-based burdens "does not necessarily mean that [the University] has no valid First Amendment claim." *Id.* at 199, 110 S.Ct. at 587. The Court characterized the University's claim as one that did not "fit neatly within any right of academic freedom that could be derived from the cases on which [the University] relie[d]," *id.,* and concluded that the University was asking the Court to recognize an expanded right of academic freedom, to protect "confidential peer review materials from disclosure." *Id.* The Court refused to rec-

ognize such an expanded right, and it held that "the First Amendment cannot be extended to embrace [the University's] claim." [9] *Id.* The *University of Pennsylvania* Court concluded that because "the EEOC subpoena process does not infringe any First Amendment right enjoyed by [the University], the EEOC need not demonstrate any special justification to sustain the constitutionality of Title VII as applied to tenure peer review materials in general or to the subpoena involved in this case." *Id.* at 201, 110 S.Ct. at 589.

This Court finds that, as in the *University of Pennsylvania* case, the First Amendment cannot be extended to insulate Defendants from the application of Title VII. The Court, of course, recognizes Defendants' First Amendment right to be free from governmental interference in determining what it publishes, just as the Supreme Court recognized the University of Pennsylvania's First Amendment right to academic freedom. Defendants, however, make only the general allegation that choosing the Review–Journal's Editor necessarily impacts on what the Review–Journal's message becomes. Without disputing this contention, the Court finds that this allegation fails to demonstrate a burden on the First Amendment. Defendants have not alleged or demonstrated that there is any relationship between their ability to choose their Editor on the basis of sex, race, or any of the other characteristics prohibited by Title VII, and their ability to control the content and character of their newspaper's message.[10] *See University of Pennsylvania,* 493 U.S. at 182 & n. 7, 110 S.Ct. at 577 & n. 7.

**9.** The Court refused to extend such First Amendment protection because it found the University's asserted "infringement" to be too attenuated, remote, and speculative.

**10.** Defendants argue in their Reply (# 37) that a court would violate the First Amendment if it were to apply Title VII to the publisher of a magazine such as "Ms." or "Essence," magazines which Defendants allege are aimed at women and blacks respectively, to require those magazines to hire a "more qualified" male or white editor over a "less qualified" female or black editor. This contention is an argument to

## IV. CONCLUSION

It is clear that the First Amendment does not invalidate every incidental burdening of the press that may result from the enforcement of civil statutes of general applicability such as Title VII which serve substantial public interests. *Branzburg v. Hayes,* 408 U.S. 665, 682, 92 S.Ct. 2646, 2657, 33 L.Ed.2d 626 (1971). Moreover, this Court fails to see how Title VII's prohibitions directly or indirectly infringe on Defendant's First Amendment rights. Indeed, this Court finds the application of Title VII in this case, like its application in the *University of Pennsylvania* case, to be content-neutral. In the absence of any indications of infringement,[11] this Court will not recognize an expanded First Amendment right to discriminate in the hiring and firing of editorial employees in violation of Title VII.

IT IS THEREFORE ORDERED THAT Defendants' Motion for Summary Judgment (# 19) is denied.

IT IS FURTHER ORDERED THAT Plaintiff's Motion for Denial of Defendants' Motion for Summary Judgment (# 33) is granted and Plaintiff's alternative Motion for Continuance is rendered moot.

permit those types of magazines to take one or more of the prohibited characteristics into account in hiring managerial or editorial employees. This Court need not make that more difficult determination, because Defendants do not contend that there is any relationship between the sex or race of their Editor and the content of what they publish in the Las Vegas Review–Journal.

**11.** *See Associated Press,* 301 U.S. at 132–33, 57 S.Ct. at 656 ("The publisher of a newspaper has no special immunity from the application of general laws").