936 P.2d 1123 (1997)
131 Wash.2d 523
Sandra S. NELSON, Appellant,
v.
McCLATCHY NEWSPAPERS, INC., and Tacoma News, Inc., Respondents.
No. 62943-9.
Supreme Court of Washington, En Banc.
Argued June 11, 1996.
Decided February 20, 1997.
As Amended on Denial of Reconsideration May 8, 1997.
*1124 Preston, Thorgrimson, Shidler, Gates & Ellis, P.S., Stephen Smith, Seattle, for Amicus Curiae/Allied Daily Newspapers.
Robert Stern, David C. Fathi, Schwerin, Burns, Campbell & French, Kathleen P. Barnard, Allen & Hansen, Todd Maybrown, Gary C. Huie, Valerie A. Carlson, Frederick W. Hyde, Jr., Seattle, for Amicus Curiae/Washington State Labor Council/National Lawyers Guild/Newspaper Guild International/Newspaper Guild Local 82/Northwest Women's Law Center.
Skellenger, Bender, Mathias & Bender, P.S., William J. Bender, Paul Chuey, Carney, Badley, Smith & Spellman, James E. Lobsenz, Seattle, for Appellant Sandra S. Nelson.
Davis, Wright & Tremaine, Thomas Lemly, Gregory Kopta, Paul DeVore, Seattle, for Respondents McClatchy Newspapers, Inc., et al.
SANDERS, Justice.
The issues in this case present two questions.[1] The first is whether the "Fair Campaign Practices Act," RCW 42.17.680(2), establishing campaign contribution limitations also prohibits an employer from discriminating against an employee because the employee refuses to remain politically abstinent? And, second, if RCW 42.17.680(2) does apply in such situations, does its application violate a newspaper's constitutionally guaranteed free press right to editorial control of the paper's content?
We find that RCW 42.17.680(2) does prohibit this employer from discriminating against an employee on the basis of the employee's refusal to remain politically abstinent. However, we conclude the statute cannot constitutionally apply to McClatchy Newspapers or The News Tribune (TNT) under the free press clause of the First Amendment to the United States Constitution.
The trial court's dismissal of Sandra Nelson's statutory and constitutional causes of action is, therefore, affirmed.

I.

FACTS
Sandra Nelson began working as a reporter for TNT in 1983, three years before McClatchy Newspapers, Inc., purchased it. When McClatchy acquired TNT in 1986 it retained Nelson as a reporter. Nelson covered the "education beat" and focused on Tacoma schools as well as regional and state educational issues and, by all accounts, did a good job.
A fundamental goal of TNT, as a news publication, is to appear objective in the *1125 eyes of its readers. As part of this effort, TNT management put forth an ethics code in 1987 regulating activity deemed to present apparent or actual conflicts of interest. The ethics code defines conflicts of interest to include all situations in which readers might be led to believe that the news reporting is biased, including situations in which reporters participate in high profile political activity. Nelson's admitted violation of this code of ethics led to her transfer and the present suit.
Journalistic codes of ethics are common. In fact, most newspapers in the country have some form of code of conduct to minimize conflicts of interest. A 1983 study indicates that 75 percent of news organizations have similar codes in place.[2] For example, The Washington Post has a code nearly identical to TNT's stating in part that newsroom employees must "`avoid active involvement in any partisan causespolitics, community affairs, social action, demonstrationsthat could compromise or seem to compromise our ability to report and edit fairly.'" Jason P. Isralowitz, The Reporter as Citizen: Newspaper Ethics and Constitutional Values, 141 U.Pa.L.Rev. 221, 222 n. 7 (1992) (quoting Benjamin C. Bradlee, Standards and Ethics, in the Washington Post Deskbook on Style 1, 3 (Thomas W. Lippman ed., 2d ed. 1989)). Similarly, the Associated Press has a code containing nearly identical provisions including "Involvement in politics, demonstrations and social causes that could cause a conflict of interest, or the appearance of such conflict should be avoided." Clerk's Papers (CP) at 231-32. The code of ethics of the Society of Professional Journalists is also similar.
Nelson is a self-professed lesbian who spends much of her off-duty hours serving as a political activist. She attends political fora, demonstrations, and classes for political causes including highly visible support for gay and lesbian rights, feminist issues, and abortion rights. Nelson is also a member of and organizer for Tacoma Radical Women, a feminist socialist organization, and the Freedom Socialist Party. Much of her political activism has been supported by this party and has been in support of its party platform. McClatchy knew of Nelson's political activities when it chose to retain her.
In 1987, Nelson was seen by a TNT reporter and photographer as she was picketing for abortion rights outside a local hospital. TNT management told her such activity compromised the paper's appearance of objectivity. Nelson responded she would continue her public political activity anyway.
In 1989, Nelson helped launch a ballot initiative to have an antidiscrimination ordinance reinstated following its repeal. Throughout 1990 she visibly promoted the initiative by organizing volunteers, soliciting support from various groups, arranging for community speakers, organizing rallies, and collecting signatures for the initiative. The initiative battle remained a major political story throughout the year and increasingly so as the fall election approached. On August 15, 1990, TNT's editors informed Nelson that she would be transferred from her position as education reporter to swing shift copy editor until after the November election. TNT stated that Nelson's activities violated the ethics code and raised concern about TNT's appearance of objectivity.
A swing shift copy editor is a nonmanagerial position requiring the same general qualifications as a reporter. Nelson maintained her salary, benefits, and seniority and edited a wide variety of local and national stories. However, she was required to work nights and weekends and was no longer a beat reporter investigating and writing stories. Nelson's transfer became permanent when she refused to promise future conformity with the ethics code.
Nelson remained politically active. For example in 1994 she actively opposed a ballot initiative which would have prevented municipalities from extending civil rights to gays and lesbians. Also in 1994 she testified before the state Legislature on behalf of the "Stonewall Committee" in support of a gay and lesbian civil rights bill. The story received front page coverage in TNT and *1126 most other state newspapers. TNT was initially alerted by a legislator who knew Nelson as a TNT employee and contacted TNT to ask if Nelson was lobbying the Legislature on TNT's behalf. TNT's editors wrote to Nelson that "We are dismayed and concerned that you have taken your political activism to a new and larger arena." CP at 405. The editors also wrote that such activity jeopardized the credibility of TNT in the eyes of its readers and the Legislature alike. They told Nelson that their discomfort had nothing to do with the content of her politics as, indeed, TNT has on several occasions adopted pro-gay positions in its editorials. TNT concluded by informing Nelson that if her political activism further compromised the paper's credibility, it would be forced to "further isolate" her and to "take appropriate disciplinary action." CP at 405.
Nelson requested TNT to reinstate her as reporter. In October 1993 she wrote to her supervisor requesting her reinstatement and she later applied for a position as reporter. In January 1995 she sent TNT a letter asking to be considered for what she asserted was an unannounced opening as education reporter.[3] Since Nelson's transfer, TNT has hired nine reporters to cover various topics. Nelson alleged that it was made clear that the positions would remain closed to her so long as she continued her high profile political activism. TNT responded that Nelson never applied for any open position; however, for the purpose of this opinion we will assume the truth of Nelson's allegations.
After unsuccessfully pursuing redress in a federal forum, Nelson filed suit in Pierce County Superior Court alleging TNT improperly stripped her of her position as reporter. Nelson alleged TNT: (a) violated RCW 42.17.680(2) of the Fair Campaign Practices Act, which Nelson claims prohibits employers from discriminating against employees based on their support of initiatives, political parties or political committees; (b) violated several provisions of the state constitution including article I, section 5 (free speech), article I, section 4 (freedom to assemble and petition government), article I, section 19 (guarantee of free elections), and article II, section 1 (popular right to initiative); (c) breached her employment contract because she was transferred without good cause; and (d) wrongfully transferred her because it is against public policy to forbid employees from participating in off-duty political activity. The trial court granted summary judgment to TNT on Nelson's claim under RCW 42.17.680 and on all her constitutional claims. The remaining breach of employment and wrongful transfer claims survived and are scheduled for trial on remand. Thus, the issue before this court is the propriety of the trial court's summary judgment dismissal of Nelson's statutory and constitutional claims.

II.

DOES RCW 42.17.680(2) APPLY?
Nelson asserts that RCW 42.17.680(2) applies. We agree.
RCW 42.17.680(2) states in full:
No employer or labor organization may discriminate against an officer or employee in the terms or conditions of employment for (a) the failure to contribute to, (b) the failure in any way to support or oppose, or (c) in any way supporting or opposing a candidate, ballot proposition, political party, or political committee.

(Emphasis added.)
Nelson asserts the statute is clear on its face and applies in her case. A fundamental rule of construction is, absent ambiguity, the plain wording of the statute controls. Anderson v. City of Seattle, 123 Wash.2d 847, 851, 873 P.2d 489 (1994). Thus, the statute prohibits discrimination based on an employee's "supporting or opposing a candidate, ballot proposition, political party, or political committee." RCW 42.17.680(2).
The issue is whether an employee who is discriminated against for refusing to abstain from political involvement fits within the statutory language of someone removed for "supporting or opposing" a ballot initiative, political party or committee. There is little *1127 outside guidance on the meaning of the provision in question and there is no case law interpreting the statute. The original version of the initiative came out of the state senate as Engrossed Substitute Senate Bill 5864, and the legislative history of intent is scarce there as well. A staff memo circulated to the senate committee originally overseeing the bill stated that, amongst other things, the bill would prohibit employers from "discriminat[ing] against employees on the basis of their political activity." Senate Comm. Staff Memorandum, Campaign Contributions & Expenditures: Highlights of Proposed Sub. S.B. 5864, at 2 (Mar. 5, 1991). Newspaper articles and editorials[4] published during the 1992 election season uniformly fail to mention this particular provision nor does the voter's pamphlet in its description of or the statements for and against the law. In all, the provision now before the court seems to have gone largely unnoticed.
Nelson urges that the plain language of the statute supports her position. And, in circumspect, one may also find support for her position in the subsection preceding the one at issue. Subsection (2)(b) states that no employer may discriminate against an employee for the "failure in any way to support or oppose" a candidate, ballot proposition, political party, or political committee. RCW 42.17.680(2)(b). Subsection (2)(c), at issue here, states that no employer may discriminate against an employee for "in any way supporting or opposing a candidate, ballot proposition, political party, or political committee." RCW 42.17.680(2)(c). Logically, subsection (2)(b) would apply when the employee fails to adopt and support the employer's political position, whereas subsection (2)(c) would apply when the employee refuses to abstain from political activity. It is difficult to imagine what subsection (2)(c) would mean if not what Nelson claims. Adopting TNT's reading that the statute does not apply when the employer merely requires political abstinence is contrary to the text of subsection (2)(c).[5]
TNT, on the other hand, asserts that the provision should be read in context. Nationwide Papers, Inc. v. Northwest Egg Sales, Inc., 69 Wash.2d 72, 76, 416 P.2d 687 (1966) ("Language within a statute must be read in context with the entire statute and construed in a manner consistent with the general purposes of the statute.").[6] TNT asserts that when read in context, the provision has a narrower meaning and will apply only when an employer attempts to strong-arm an employee into adopting its political position. The trial court agreed with TNT and held the statute applies only when the employer requires an employee to adopt its political position and does not apply when the employer merely requires political neutrality of its employees.
Initiative 134 which contains the provision in question was aimed at repairing the political process through campaign finance reform.[7] The primary change proposed by the initiative was the imposition of contribution *1128 limits that individuals and entities could give per candidate per election. The initiative also sought to prohibit contributions from one candidate's campaign to another, forbid public funding of campaigns, limit the repayment of loans taken out while campaigning, and prohibit fundraising by legislators during session. The official ballot title asked:
Shall campaign contributions be limited; public funding of state and local campaigns be prohibited; and campaign related activities be restricted?
1992 Voters Pamphlet, Initiative Measure 134, at 8.
One of the stated purposes of the initiative was to prevent financially strong organizations from exercising a disproportionate or controlling influence on elections. RCW 42.17.610(1). In 1993, the initiative became codified under the heading of Campaign Contribution Limitations under chapter 42.17 RCW, the public disclosure act, the purpose of which is to inform the public of campaign and lobbying contributions and to help ensure, through disclosure, the integrity of government. See Cowles Publishing Co. v. State Patrol, 109 Wash.2d 712, 719, 748 P.2d 597 (1988).
TNT argues the statutory provision in question was not intended to apply as Nelson asserts. Washington already has a labor law statute forbidding discrimination against an employee on the basis of age, sex, marital status, race, creed, color, national origin, or physical handicap. RCW 49.60.180. Nelson's reading, TNT argues, in effect creates an additional category, that of political activist, but would locate it in the campaign finance reform law rather than in labor or other civil rights laws.[8] TNT argues if creation of such a broad right was intended, why was it quietly slipped into campaign finance reform?
But TNT's interpretation does not track the text of the act. When read in context this law has a clear relation to the rest of the campaign finance reform act; it is meant to prevent employers from wielding their might to influence politics and elections. The law is part of campaign finance, not civil rights or labor law. Taken as a whole, the provision in question means that employers may not disproportionately influence politics by forcing their employees to support their position or by attempting to force political abstinence on politically active employees. The law is designed to restrict organizations from wielding political influence by manipulating the political influence of their employees through employment decisions. Moreover, TNT's reading essentially renders the provision in question meaningless as RCW 42.17.680(2)(b) already covers the interpretation urged by TNT. Nisqually Delta Ass'n v. City of DuPont, 95 Wash.2d 563, 568, 627 P.2d 956 (1981) (whenever possible, courts should avoid a statutory construction which nullifies, voids, or renders meaningless or superfluous any section or words).
We hold RCW 42.17.680(2) applies to the present case and substantial evidence supports its application.
We now turn to the constitutional issue which we find dispositive.

III.
DOES RCW 42.17.680(2) UNCONSTITUTIONALLY INFRINGE ON TNT'S RIGHT TO FREEDOM OF THE PRESS?
We hold that RCW 42.17.680(2) unconstitutionally infringes on TNT's right to freedom of the press.
TNT asserts that RCW 42.17.680(2) as applied to it violates the First Amendment to the United States Constitution[9] and article I, *1129 section 5, of the state constitution.[10] In particular, TNT asserts that the free press clause of both constitutions guarantees it editorial discretion to control the content of its publication. TNT further asserts that controlling the newspaper's credibility is an integral component of this. TNT argues its conflict of interest policies are designed to control its credibility and are a reflection of its content. TNT concludes that requiring its reporters to abide by its no-conflict-of-interest policy is necessary to uphold its editorial integrity, which TNT asserts is constitutionally protected. Accordingly, TNT claims that RCW 42.17.680(2) does not apply to it in this case. On the contrary, Nelson asserts that what TNT's reporters do on their own time has nothing to do with the content or credibility of the newspaper and accordingly the free press clauses of the federal and state constitutions are irrelevant. While the trial court dismissed Nelson's statutory claim holding the statute inapplicable, it redundantly ruled in TNT's favor on this point as well, reasoning:
The First Amendment and the Washington Constitution protect Defendants' editorial discretion. Under the First Amendment and the Washington Constitution, Defendants have a right to protect the newspaper's unbiased content, both its facts and as perceived by its readers, its sources and its advertisers. In order to protect the newspaper's credibility, Defendants may enforce the political neutrality of reporters.
CP at 425-29.
We agree with TNT and affirm the trial court on this ground.
The free speech clauses of the federal and state constitutions have always held a revered position in our society. Laurence Tribe, a preeminent constitutional law scholar, has characterized free speech as "the Constitution's most majestic guarantee." Laurence H. Tribe, American Constitutional Law § 12-1, at 785 (2d ed. 1988). Free speech is a fundamental right on its own as well as a keystone right enabling us to preserve all other rights. Id. As one federal judge has noted, "Free speech is the single most important element upon which this nation has thrived." Guzick v. Drebus, 305 F.Supp. 472, 481 (N.D.Ohio 1969), aff'd, 431 F.2d 594 (6th Cir.1970), cert. denied, 401 U.S. 948, 91 S.Ct. 941, 28 L.Ed.2d 231 (1971).
The Supreme Court has observed "the Founders ... felt that a free press would advance `truth, science, morality, and arts in general' as well as responsible government." Curtis Publishing Co. v. Butts, 388 U.S. 130, 147, 87 S.Ct. 1975, 1987, 18 L.Ed.2d 1094 (1967) (quoting Letter to the Inhabitants of Quebec, 1 Journals of the Continental Cong. 108 (1774)). From the start we have acknowledged that active protection from governmental abridgment is essential. Upon presenting the Bill of Rights to Congress in 1789 James Madison declared "the liberty of the press is expressly declared to be beyond the reach of this government. ..." (quoting Hugo L. Black, A Constitutional Faith 46 (1968) (quoting 1 Annals of Congress 141 (1857) (1789-96))). Madison later explained that we should err on the side of upholding and protecting the freedom of the press:
Among those principles deemed sacred in America, among those sacred rights considered as forming the bulwark of their liberty, which the Government contemplates with awful reverence and would approach only with the most cautious circumspection, there is no one of which the importance is more deeply impressed on the public mind than the liberty of the press. That this liberty is often carried to excess; that it has sometimes degenerated into licentiousness, is seen and lamented, but the remedy has not yet been discovered. Perhaps it is an evil inseparable from the good with which it is allied; perhaps it is a shoot which cannot be stripped from the stalk without wounding vitally the plant from which it is torn. However desirable those measures might be which might correct without enslaving the press, they have never yet been devised in America.

Rosenbloom v. Metromedia, Inc., 403 U.S. 29, 51, 91 S.Ct. 1811, 1823, 29 L.Ed.2d 296 *1130 (1971) (emphasis in original) (quoting 6 Writings of James Madison, 1790-1802, at 336 (G. Hunt ed. 1906)).
Since the first days of the republic, our courts have recognized the importance of a free press and have remained vigilant to protect it from government intrusion. Justice Dolliver wrote "A free press is certainly an essential and crucial ingredient of a democratic society." Herron v. KING Broadcasting Co., 109 Wash.2d 514, 527, 746 P.2d 295 (1987) (Dolliver, J., concurring specially). Further, of all the media, the written press has been protected most vehemently. Professor Tribe informs us "[t]he first amendment guarantee of freedom from government intrusion reigns most confidently in the realm of the print media...." Laurence H. Tribe, American Constitutional Law § 12-25, at 1003 (2d ed. 1988).
We take note of a national trend to emphasize the First Amendment protection. The United States Supreme Court has recently set the pace in stressing the importance of vigorously protecting free speech within our system.[11] One scholar has acknowledged "[t]he contemporary Court is moving from the formalism and restrictiveness of the Burger Court retrenchment to a more ... liberal conception of free speech practice." Keith Werhan, The Liberalization of Freedom of Speech on a Conservative Court, 80 Iowa L.Rev. 51, 52 (1994). We also recognize that this trend has arrived at the state courts as well.[12] These principles, concerns, and trends are absolutely consistent with our decision today.
While TNT claims protection from both the federal and state constitutional free press clauses, it fails to conduct a Gunwall analysis[13] or show why the state provision should be interpreted differently. We have repeatedly held that failure to do so will lead us to interpret the state constitutional clause coextensively with its parallel federal counterpart, and we will do so here. See State v. Furman, 122 Wash.2d 440, 448, 858 P.2d 1092 (1993).
When addressing whether a governmental regulation or action affecting the press is violative of its constitutional free press protection, we begin by noting the two governing polar principles and then consider where the complained action falls. On one extreme is the general principle that a newspaper has "no special immunity from the application of general laws" simply because it is the press. Associated Press v. N.L.R.B., *1131 301 U.S. 103, 132, 57 S.Ct. 650, 655-56, 81 L.Ed. 953 (1937). On the opposite side is the principle that the government absolutely may not regulate the content of a newspaper. Miami Herald Publishing Co. v. Tornillo, 418 U.S. 241, 94 S.Ct. 2831, 41 L.Ed.2d 730 (1974).
Miami Herald Publishing is the seminal case on the issue. In Miami Herald the United States Supreme Court held that the state absolutely may not regulate the content of a newspaper. 418 U.S. at 258, 94 S.Ct. at 2839-40. At issue was the constitutionality of a Florida "right-of-access" statute which forced newspapers to publish responses of politicians who had been criticized by the paper. At the heart of Miami Herald is the notion that in order to uphold the circulation of ideas the editors of a newspaper must be free to exercise editorial control and discretion. Id. at 258, 94 S.Ct. at 2839-40. The court held that "`[l]iberty of the press is in peril as soon as the government tries to compel what is to go into a newspaper.'" Id. at 258 n. 24, 94 S.Ct. at 2840 n. 24 (quoting 2 Zechariah Chafee, Jr., Government and Mass Communications 633 (1947)). The court concluded because the state law deprived the paper of its editorial discretion, it was necessarily unconstitutional as applied to the newspaper.[14]
Thus, Miami Herald clearly establishes that editorial control is a necessary component of the free press and a state law infringing thereon will be unconstitutional as applied.
Following Miami Herald was Passaic Daily News v. N.L.R.B., 736 F.2d 1543 (D.C.Cir.1984). Passaic held a newspaper could not be constitutionally required to publish a reporter's column as a remedy for unlawful termination because it would interfere with the paper's editorial function. Id. at 1558. If a newspaper cannot be required to publish a particular reporter's work, how can it be constitutionally required to employ the individual as a reporter? Perhaps the paper could be ordered to employ the reporter for noneditorial services, but that is exactly what TNT is presently doing.
Editorial integrity and credibility are core objectives of editorial control and thus merit protection under the free press clauses. This conclusion is illustrated by a well-worded opinion by Chief Justice Burger: "The power of a privately owned newspaper to advance its own political, social, and economic views is bounded only by two factors: first, the acceptance of a sufficient number of readersand hence advertisersto assure financial success; and, second, the journalistic integrity of its editors and publishers." Columbia Broadcasting Sys., Inc. v. Democratic Nat'l Comm., 412 U.S. 94, 117, 93 S.Ct. 2080, 2094, 36 L.Ed.2d 772 (1973) (Burger, C.J., plurality op.). Our conclusion is also supported by academic texts showing credibility to be crucial to a paper's ability to operate. For example, a piece chronicling the development of the print media indicates that by 1900 "[i]mpartial gathering and reporting of the news were generally recognized to be the basic obligation of newspapers." Warren K. Agee et al., Introduction to Mass Communications 57 (7th ed. 1982).
In Newspaper Guild of Greater Philadelphia v. N.L.R.B., 636 F.2d 550, 560 (1980), the circuit court wrote that editorial integrity is to a newspaper what machinery is to a manufacturer. The court stated that "protection of the editorial integrity of a newspaper lies at the core of publishing control." Id. at 560. The court continued: "At least with respect to most news publications, credibility is central to their ultimate product and to the conduct of the enterprise." Id. at 560. Accordingly, the court noted that a newspaper's ability to control its credibility falls within the sphere of First Amendment protection *1132 and laws infringing thereon must be scrutinized. Id. at 560.
The Newspaper Guild court continued that
In order to preserve [its managerial prerogative to control its editorial integrity,] a news publication must be free to establish without interference, reasonable rules designed to prevent its employees from engaging in activities which may directly compromise their standing as responsible journalists and that of the publication for which they work as a medium of integrity.
Id. at 561 (footnotes omitted).
This is directly on point. The no-conflict-of-interest policy employed by TNT was expressly designed for the exact purpose of upholding TNT's credibility. This policy therefore merits protection under the free press clauses of the state and federal constitutions.
Nelson claims Associated Press v. N.L.R.B., 301 U.S. 103, 57 S.Ct. 650, 81 L.Ed. 953 (1937), supports her position that codes of ethics regulating high profile employee activity do not go to a newspaper's core function and hence are not protected under the free press clauses. There the Associated Press fired one of its editors for attempting to unionize the work force. Id. at 124-25, 57 S.Ct. at 652-53. Firing the editor violated the National Labor Relations Act's specific grant to workers to form, join, and participate in labor unions. Id. at 123, 57 S.Ct. at 651-52. The court, by a five to four vote with a strong dissent by Justice Sutherland, found the NLRA constitutional, id. at 132, 57 S.Ct. at 655-56, but also concluded the true motivation for the firing related to union membership, not editorial prerogative.
The court rested its decision on a finding that unionizing had "no relation whatever" to Associated Press's news distributing function. Id. at 133, 57 S.Ct. at 656. Thus, Associated Press must be distinguished from this case. While internally unionizing a small work force may not impinge on a news publication's credibility and integrity vis-à-vis the outside world, high profile politicized activities of a reporter arguably do. The Associated Press case affirmatively supports this view. In particular, the decision unambiguously noted that it was not commenting on whether Associated Press could discharge the editor if or when his continued activity led Associated Press to believe its appearance of impartiality was subverted. Id. at 132, 57 S.Ct. at 655-56. On the contrary, the Associated Press decision itself noted that Associated Press could still publish the news as it desired and could still create and enforce policies of its own choosing. Id. at 133, 57 S.Ct. at 656. The court also stated that Associated Press would be free to discharge the editor or any editorial employee who fails to comply with the policies it may adopt. Id. at 133, 57 S.Ct. at 656. If a publisher may discharge an employee for failing to comply with its editorial policies, it should be equally entitled to transfer an employee to an equal-paying position which has less public exposure. Associated Press does not hold that freedom of the press may be violated by any general law but only that general law (the NLRA) did not.
We think this language in Associated Press clearly supports this view that TNT's actions were within its constitutionally protected sphere of control of editorial integrity and credibility even though the statute in question is a general law.
Further, the Associated Press case is limited to the NLRA and union activity. We are mindful of the context in which the Associated Press case was decided. Indeed, Associated Press was handed down at the height of President Roosevelt's New Deal and political attacks on the court. Finding the NLRA unconstitutional (which four members of the court were prepared to do) would have represented an unpopular blow to President Roosevelt's attempts to restructure government and society through national legislation such as the NLRA. We should not stretch Associated Press beyond limits carefully crafted as part of the original text to guide its application.
Nelson also points to Hausch v. Donrey of Nevada, Inc., 833 F.Supp. 822 (1993), to support her assertion that TNT's attempt to protect its editorial integrity and credibility did not fall within the zone of free press protections. In Hausch the United States District Court for Nevada held the press is *1133 not immune from suit under the antidiscrimination laws of Title VII of the Civil Rights Act of 1964 simply because it is the press. Id. at 830. However, the court there noted that the paper had not alleged that its ability to control the integrity and credibility of the paper had been affected by the antidiscrimination laws. Id. at 829. Accordingly Hausch is not on point.
Here, TNT implemented a code of ethics which it designed in good faith to foster the newspaper's integrity and credibility. Case law unambiguously allows a news publication to follow a code designed to limit conflicts of interest which may diminish publication credibility. TNT adopted such a code. Freedom of the press leaves such decisions to the press, not the legislature or the courts. The code is facially designed to uphold the appearance of impartiality. Indeed, the code seems representative of those in place at 75 percent of our nation's newspapers.[15] In fact, as stated earlier, it is nearly identical to those employed by the Associated Press, The Washington Post, and the Society of Professional Journalists.

IV.

CONCLUSION
We recognize Nelson's statutory right to avoid workplace discrimination based on her politics. Since this right is established by the statute we need not consider whether it is also established by the state constitution. However, the First Amendment freedom of the press is the constitutional minimum regardless of the legal source of government abridgment. Choosing an editorial staff is a core press function, at least when that choice is based on editorial considerations. That is the case here. This statute has been unconstitutionally applied. The trial court's summary judgment dismissal of statutory claims is affirmed and McClatchy shall recover its costs on appeal. The case is remanded for further appropriate proceedings.
DURHAM, C.J., and SMITH, GUY, MADSEN, ALEXANDER and TALMADGE, JJ., concur.
DOLLIVER, Justice, dissenting.
I disagree that the statute would be unconstitutional as applied to the press here. The First Amendment does not give a newspaper immunity from general laws absent a showing of interference with the newspaper's right to determine what to print.
The majority asserts that this case illustrates a conflict between two "polar principles" in First Amendment jurisprudence. Majority at 1130. The majority acknowledges, on the one hand, "that a newspaper has `no special immunity from the application of general laws' simply because it is the press." Majority at 1130 (quoting Associated Press v. N.L.R.B., 301 U.S. 103, 132, 57 S.Ct. 650, 656, 81 L.Ed. 953 (1937)). On the other hand, the majority reasons, the government may not regulate the content of a newspaper. Majority at 878-879 (citing Miami Herald Publishing Co. v. Tornillo, 418 U.S. 241, 258, 94 S.Ct. 2831, 2839-40, 41 L.Ed.2d 730 (1974)). I see no conflict between these principles in this case because there has been no showing that the government would be regulating content by enforcing this statute. No one has alleged that Ms. Nelson's reporting was influenced in any way by her political views. Nor has anyone alleged that application of the statute would impinge upon the newspaper's exclusive right to determine what to print.
*1134 The First Amendment prohibits the government from regulating what a newspaper prints. Miami Herald Publishing Co. v. Tornillo, 418 U.S. at 258, 94 S.Ct. at 2839-40. The majority cites this principle to support its holding that the First Amendment also prohibits government regulation of a newspaper's employment decisions. However, there is a distinction between regulation of content and regulation of employment decisions, as is illustrated in Passaic Daily News v. N.L.R.B., 736 F.2d 1543 (D.C.Cir.1984).
In Passaic Daily News, the District of Columbia Circuit held that the defendant newspaper had improperly demoted a columnist due to his outside labor union activities. Passaic Daily News, 736 F.2d at 1555-56. The court stated that the First Amendment did not insulate the press from application of a federal statute prohibiting employers from discharging employees for labor union activity. Yet, at the same time, the court held that the newspaper could not be forced to print the reporter's weekly editorial column as a remedy for the illegal demotion. Passaic Daily News, 736 F.2d at 1558. Passaic Daily News makes it clear that there is a distinction under the First Amendment between government regulation of the press's labor practices and government regulation of editorial control. Whereas the former is allowed, the latter is prohibited by the First Amendment.
Referring to Passaic Daily News, the majority states, "[i]f a newspaper cannot be required to publish a particular reporter's work, how can it be constitutionally required to employ the individual as a reporter?" Majority at 878. Yet, this was precisely what happened in Passaic Daily News: The newspaper was not required to publish the reporter's weekly editorial column, but it was also prohibited from demoting him due to his activities. The reporter was still allowed to report on local stories; he was just not allowed to write a controversial editorial column. For the court to have ordered the newspaper to continue to publish the column would have been to completely usurp its editorial control. In contrast, the reporter here writes only unbiased stories. There has been no showing that the newspaper's editorial control would be threatened by her continued employment as a reporter.
The majority relies upon Newspaper Guild of Greater Philadelphia v. N.L.R.B., 636 F.2d 550, 560-61 (1980) to buttress its holding that the First Amendment gives the newspaper the right to adopt internal policies protecting its credibility. Majority at 878-879. Although Newspaper Guild addressed the type of policy at issue here, it did so as a means to concluding that a labor union does not have the right to bargain on all aspects of a newspaper's ethics code. The court was not deciding whether an individual employee's statutory and constitutional rights to political expression were trumped by a newspaper's First Amendment right to enforce its ethics code. The case thus provides limited precedential value.
In contrast, the Supreme Court considered whether an individual employee's statutory rights were trumped by a newspaper's First Amendment rights in Associated Press v. N.L.R.B, 301 U.S. 103, 132, 57 S.Ct. 650, 655-56, 81 L.Ed. 953 (1937). There the Court held that the newspaper could not claim First Amendment immunity from provisions of the National Labor Relations Act protecting an employee's right to organize. Associated Press, 301 U.S. at 132, 57 S.Ct. at 655-56. The Court noted that there had been no allegation that the reporter's work was biased, and held that the discharge had been on behalf of the reporter's outside union activity, which was specifically protected by federal law. Associated Press, 301 U.S. at 131-32, 57 S.Ct. at 655-56. Just as those statutory provisions protect outside labor activity, the provisions of the Fair Campaign Practices Act protect outside political activity. Absent a showing of bias in Ms. Nelson's work, and a consequent interference with The News Tribune's right to editorial control from the application of the statute, the newspaper cannot claim First Amendment immunity here.
JOHNSON, J., concurs.
NOTES
[1] We need not address whether the state constitutional Declaration of Rights vests additional rights in Sandra Nelson, having determined her state law entitlement was trumped by the First Amendment free press clause.
[2] Jason P. Isralowitz, The Reporter as Citizen: Newspaper Ethics and Constitutional Values, 141 U.Pa.L.Rev. 221, 229 (1992).
[3] An education reporter was apparently reassigned to political reporting presumably leaving an opening. TNT denied there was any such opening.
[4] TNT editorialized in favor of the initiative. Initiative 134 is Flawed But Useful, The Morning News Tribune, Oct. 30, 1992, at A10; Instant Replay: Our Election Choices, The Morning News Tribune, Nov. 1, 1992, at C4.
[5] For further support of her position Nelson points to a senate attempt to repeal the provision in question. Once the present lawsuit was filed and the trial court issued its summary judgment ruling the statute came to the Legislature's attention. The senate passed a bill in 1995 (which was vetoed) which would have repealed the provision in question. CP at 375 (Engrossed Second Substitute S. Bill 5576, 54th Leg., Reg. Sess., § 5 (1995)). Senate staffers interpreted RCW 42.17.680(2)(c), the provision now in question, to prohibit "employers or labor organizations from demanding the appearance of political neutrality from their employees." See CP at 393-95 (Senate Bill Rep. E2SSB 5576). Nelson suggests this indicates that her reading is the correct one. She states that the Legislature failed to repeal the prohibition on an employer demanding political neutrality, and now the court cannot repeal the same by construing it to not exist. The fact that a legislator or a staffer interpreted a statute to create rights and obligations several years after its popular passage should not be viewed as a reflection of legislative intent. State v. Leek, 26 Wash.App. 651, 657-58, 614 P.2d 209, review denied, 94 Wash.2d 1022 (1980).
[6] The rules of statutory construction apply to initiatives. Seeber v. Washington State Public Disclosure Comm'n, 96 Wash.2d 135, 139, 634 P.2d 303 (1981).
[7] The initiative, I-134, passed by popular vote in November 1992 with a 72 percent margin.
[8] Compare Cal. Labor Code § 1101 (West 1996), which states: "No employer shall make, adopt, or enforce any rule, regulation, or policy: (a) [f]orbidding or preventing employees from engaging or participating in politics ...."; and LA.Rev.Stat. Ann. § 961 (West 1996), which states: "no employer having regularly in his employ twenty or more employees shall make, adopt, or enforce any rule, regulation, or policy forbidding or preventing any of his employees from engaging or participating in politics, or from becoming a candidate for public office." Note the explicit language used and their placement in the antidiscrimination portions of labor codes.
[9] The First Amendment to the United States Constitution provides that "Congress shall make no law ... abridging the freedom ... of the press...."
[10] Const. art. I, § 5, of the state constitution states: "Every person may freely speak, write and publish on all subjects, being responsible for the abuse of that right."
[11] For recent decisions giving great weight to free speech protection, see Capitol Square Review & Advisory Bd. v. Pinette, 515 U.S. 753, 115 S.Ct. 2440, 132 L.Ed.2d 650 (1995) (Ku Klux Klan erection of a cross on town square is protected free speech); Hurley v. Irish-American Gay, Lesbian & Bisexual Group of Boston, 515 U.S. 557, 115 S.Ct. 2338, 132 L.Ed.2d 487 (1995) (state law requiring parade organizers to allow gay group to march is an unconstitutional infringement on organizers' free speech); Rosenberger v. Rector & Visitors of the Univ. of Va., 515 U.S. 819, 115 S.Ct. 2510, 132 L.Ed.2d 700 (1995) (state university's refusal to fund religious publication violative of free speech); Lamb's Chapel v. Center Moriches Union Free Sch. Dist., 508 U.S. 384, 113 S.Ct. 2141, 124 L.Ed.2d 352 (1993) (school district violated church's free speech rights by refusing church's request to use school facilities for religious oriented film series on family values and child-rearing); City of Ladue v. Gilleo, 512 U.S. 43, 114 S.Ct. 2038, 129 L.Ed.2d 36 (1994) (invalidating a city ordinance banning various signs in residential neighborhoods as violative of free speech); City of Cincinnati v. Discovery Network, Inc., 507 U.S. 410, 113 S.Ct. 1505, 123 L.Ed.2d 99 (1993) (invalidating city ordinance prohibiting newsracks on public property); R.A.V. v. City of St. Paul, 505 U.S. 377, 112 S.Ct. 2538, 120 L.Ed.2d 305 (1992) (invalidating St. Paul's hate speech "Bias-Motivated Crime Ordinance" as violative of free speech); Forsyth County v. Nationalist Movement, 505 U.S. 123, 112 S.Ct. 2395, 120 L.Ed.2d 101 (1992) (invalidating state law allowing officials discretion over parade permits based on cost of policing); Simon & Schuster, Inc. v. Members of the N.Y. State Crime Victims Bd., 502 U.S. 105, 112 S.Ct. 501, 116 L.Ed.2d 476 (1991) (invalidating New York's "Son of Sam" law, which prohibited those accused or convicted of a crime from deriving income generated by works that describe the crime as violative of free speech).
[12] See, e.g., City of Eugene v. Miller, 318 Or. 480, 871 P.2d 454 (1994) (Oregon Supreme Court invalidating a municipal vending ordinance prohibiting sale of goods on sidewalk as applied to vendor of joke books as violative of free speech); also see Miller v. City of Laramie, 880 P.2d 594 (Wyo.1994) (city ordinance banning littering violative of First Amendment free speech guarantees when applied to distributor of free newspaper).
[13] State v. Gunwall, 106 Wash.2d 54, 720 P.2d 808, 76 A.L.R.4th 517 (1986).
[14] A newspaper is more than a passive receptacle or conduit for news, comment, and advertising. The choice of material to go into a newspaper, and the decisions made as to limitations on the size and content of the paper, and treatment of public issues and public officialswhether fair or unfairconstitute the exercise of editorial control and judgment. It has yet to be demonstrated how governmental regulation of this crucial process can be exercised consistent with First Amendment guarantees of a free press as they have evolved to this time.

Miami Herald, 418 U.S. at 258, 94 S.Ct. at 2839-40 (footnote omitted).
[15] We note that many other employers have codes in place regulating and limiting off-duty employee conduct. For example in United States Civil Serv. Comm'n v. National Ass'n of Letter Carriers, 413 U.S. 548, 565, 93 S.Ct. 2880, 2890, 37 L.Ed.2d 796 (1973) the court upheld restrictions on government employees' political activity reasoning that "it is not only important that the Government and its employees in fact avoid practicing political justice, but it is also critical that they appear to the public to be avoiding it, if confidence in the system of representative Government is not to be eroded to a disastrous extent." We note that the federal government there did not have the free press protections afforded to TNT nor any other constitutional rights, yet the Supreme Court still upheld the code of conduct. For the same result applicable to a state's ability to restrict political activity of state employees, see Broadrick v. Oklahoma, 413 U.S. 601, 93 S.Ct. 2908, 37 L.Ed.2d 830 (1973) (a state may require employees to refrain from political activity).